652 P.2d 507

Sharon GRANT, personal representative of the estate of Koy Grant, deceased; Sharon Grant individually and on behalf of Jason Grant and Jared Grant, minors, Plaintiffs-Appellees,

v.

ARIZONA PUBLIC SERVICE COMPANY, an Arizona corporation, Defendant-Appellant.

No. 15761–PR.

Supreme Court of Arizona,
En Banc.

June 28, 1982.

Supplemental Opinion Oct. 7, 1982.

Rehearing Denied Oct. 5, 1982.

436

Gerald W. Alston, Browder & Kenney by Robert W. Browder, Norton, Burke, Berry & French by William P. French, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Ralph E. Hunsaker, Robbins & Green by Michael J. O'Grady, Daughton, Feinstein & Wilson by Donald Daughton, Fennemore, Craig, von Ammon & Udall by Philip E. von Ammon, Gust, Rosenfeld, Divelbess & Henderson by Richard A. Segal, Jennings, Strouss & Salmon by Gary L. Stuart, Wentworth & Lundin by John E. Lundin, Evans, Kitchel & Jenckes by Burton M. Apker, Ryley, Carlock & Ralston by George Read Carlock, C. A. Carson, Phoenix, Howard H. Karman, Casa Grande, Chandler, Tullar, Udall & Redhair by Jack Redhair, Slutes, Browning, Sakrison & Grant by Tom Slutes, William D. Browning, Johnson, Dowdall & Payne by J. Mercer Johnson, Lesher, Clausen & Borodkin by Robert O. Lesher, Murphy & Hazlett by Carl Hazlett, Tucson, amici curiae.

FELDMAN, Justice.

Sharon Grant brought this action to recover damages for the wrongful death of her husband, Koy Grant. The trial court entered judgment in favor of the plaintiffs on a jury verdict of $1,000,000 in favor of Ms. Grant and $250,000 to each of her two children. The court of appeals reversed, *Grant v. Arizona Public Service*, 133 Ariz. 475, 652 P.2d 548 (App.1981). We granted Grant's Petition for Review and now vacate the opinion of the court of appeals and affirm the judgment of the trial court. This court has jurisdiction pursuant to A.R.S. § 12–120.24.

Grant died on February 3, 1976, as the result of electrocution. At the time of his death, he was a carpenter employed by Kensington West-Mayo Construction Company (Kensington). Kensington was the prime contractor for the City of Phoenix in the construction and installation of a new storm sewer. The construction work involved use of a backhoe to excavate a large trench in 15th Avenue, which runs in a north-south direction, and the use of a crane to lift sections of 6-foot diameter storm sewer pipes from the ground drop

Charles M. Brewer, Ltd. by Charles M. Brewer, Stuart J. Reilly, Phoenix, for plaintiffs-appellees.

Snell & Wilmer by George H. Lyons, Loren W. Counce, Jr., Phoenix, for defendant-appellant.

and set them in the trench. The crane operated on the east side of the trench with its boom extending to the west, and moved north along the east side of the trench as the work proceeded from south to north. After the crane had laid the pipe in a section of trench, the trench was closed with earthmovers and the men and equipment proceeded north to the next section of work, where the process was repeated.

Power lines under the control of respondent Arizona Public Service (APS) ran in a north-south direction on the west side of 15th Avenue, 35 feet above ground level. Thus, they were parallel to and at the west edge of the sewer line excavation. The lines were uninsulated and carried 12,000 volts. At various points along 15th Avenue, branches from the main north-south power line on the west side of 15th Avenue ran east, crossing the street and the trench excavation. The diagram below, similar to Exhibit 340 in evidence, depicts the excavation site:

By December of 1975, work had progressed to a point near the intersection of 15th Avenue and Watkins Road. At this intersection, a "special construction feature" (de-

scribed below in more detail) required that the trenching excavation be made considerably wider and deeper. A subcontractor, Lester Construction Company (Lester), was engaged to install sheet piling for shoring to prevent the cave-in of the west excavation wall. Lester was using a crane, no larger than the Kensington crane, to raise the pieces of metal sheet piling from the ground, position them over the excavation, lower them into the hole and hold them in a vertical position next to the west bank, while the workmen in the hole anchored the lower end of the piling to a frame positioned at the bottom of the excavation. Like the Kensington crane, the Lester crane was positioned at the east side of the excavation, with the boom extended above and to the west of it, at an angle of approximately 60° from the ground. As the crane hook, lines and sheet piling descended from the top end of the crane boom to the bottom of the excavation, the crane lines passed within a few feet of APS power lines at the edge of the west bank.

At the time of the accident, Grant was in the bottom of the excavation doing his assigned work of attaching the piling to the excavation wall. A fellow employee was standing on the ground above the west side of the excavation holding a tag line. He inadvertently pulled the tag line so that it came into contact with the power lines. High-voltage electricity traveled down the crane lines, electrocuting Grant.

The trial court denied APS' motion for a directed verdict, sent the case to the jury on the theory of negligence and instructed the jury on punitive damages. The jury awarded compensatory damages but did not make an award of punitive damages. The court of appeals found that the cumulative effect of errors at trial was prejudicial and denied APS a fair trial. It therefore reversed and

remanded for a new trial. The various issues raised by APS will be considered separately and additional facts will be given where appropriate.

### APS' MOTION FOR A DIRECTED VERDICT

APS argues that the trial court erred by denying its motions for summary judgment and for a directed verdict. We agree with the court of appeals that denial of these motions was not error.

 As the court of appeals indicated, the law requires a distributor of electric power to take precautions reasonably commensurate with the dangers involved whenever the distributor can reasonably anticipate that persons may come into contact with its lines. *Mason v. Arizona Public Service*, 127 Ariz. 546, 551–52, 622 P.2d 493, 498–99 (App.1980). APS argues that it neither had knowledge of the specific danger nor opportunity to take steps to avoid injury to plaintiff. APS cites many cases holding both that a public utility has no "duty" to anticipate that a contractor or its workmen in the vicinity of high-voltage lines will use a crane that may come into contact with the lines, and that a utility which has no reason to foresee that workmen on the ground are endangered by lines high above ground level cannot be held negligent for simply maintaining such lines.

This argument, although correct in principle, is not applicable to the facts of this case. The plans here called for the construction of a box culvert at the intersection of 15th Avenue and Watkins, and it was during the construction of that box culvert that the contact between the crane cable and the power lines occurred.[1] This "special construction feature" was detailed on the plans which were given Arizona Public Service; in fact, APS' gas division had removed its underground gas lines from the

---

1. The box culvert was necessitated because at the Watkins Road intersection the storm sewer had to pass under an existing large pipeline which was 20 feet below the surface. Therefore, at this intersection, excavation would be required to a depth of 31 feet below ground surface, and the width of the excavation was to

be much greater than at other points in the project, thus bringing the construction equipment closer to the power lines on the west side of 15th Avenue. Also, because of this increased depth and width (and some soil problems), it was necessary to shore the sides of the excavation by installation of the sheet piling.

utility easement shared with the power lines and had relocated the gas line a distance of some feet to the west. In addition, there was evidence that Kensington's construction superintendent, Clarke, and APS' safety liaison officer discussed use of a crane to set piles on the west side of the excavation. Testimony also indicated that on December 16, 1975, APS warned the contractor about the hazards of a crane working near the high-voltage lines located at Watkins and 15th Avenue. The city inspector who was present at a meeting between the APS representative and the construction superintendent on December 19, 1975, made a diary entry as follows:

APS said they could remove the [branch] lines ... that service Starlight Company [on the east side of the excavation] but could not do anything with the [main] lines on the west side, but they will continue to brace the poles as needed.[2]

In addition, the inspector testified regarding a conversation he heard about de-energizing the lines in order to protect the workmen in case there was contact with the crane. That testimony was as follows:

[W]hat did Mr. Clarke tell Mr. Miller [the APS representative]?

A. Mr. Clarke told him to the effect that he had to build something down under the big line, which wasn't exposed at that time, and that he was also going to have to drive some piling in that area.

Q. Do you remember, does anything else stick in your mind as to what Mr. Clarke told Mr. Miller on that occasion at this vicinity?

A. Well, they were still discussing, which, I couldn't hear every word of the conversation, I was getting ready to leave. But, I heard Mike holler, or kind of holler, raise his words, and he says, "Well, can't you kill the God damn thing?" I don't talk like that, I'm sorry, but, that's what he said, couldn't he kill [de-energize] the damn thing.

Q. Pointing to these lines running on the west side of 15th Avenue?

A. Yes, sir.

Clarke claimed that APS told him that "nothing could be done" because of the need to continue service to downstream power customers. APS claimed it told Clarke it could take precautions if he made a proper request. Because we must view the evidence in the light most favorable to sustain the verdict and judgment, *Lane Title & Trust Co. v. Brannan,* 103 Ariz. 272, 279, 440 P.2d 105, 112 (1968), we assume the jury properly accepted Clarke's version.

In addition to the testimony that would have allowed the jury to conclude that APS was aware of the actual danger, there was ample testimony from which the jury could have concluded that APS should have been aware of the danger even without direct knowledge. Evidence established that APS' program of safety included study of construction plans of projects in the vicinity of high-voltage lines, walking the construction site to check the plans against the lines, meetings with contractors and regulatory officials to determine what procedures would be undertaken by the contractor that might present dangers, and similar matters. Thus, the jury could easily have concluded that APS not only foresaw the type of dangers which existed in this case, but had established a safety policy which required it to ascertain and evaluate such dangers in order to take appropriate action to minimize accidents.

With all this in mind, it is apparent that plaintiffs made a strong case of negligence. APS may not have known that the particular crane was to be used on the day and at the particular site in question. Undoubtedly, however, there were facts from which the jury could have concluded that APS knew or should have known that a crane was being used on the job to set the storm sewer pipe and that a crane would be used on the job at the Watkins Road intersection to set piling to be used for shoring. APS knew that a serious danger was presented

---

**2.** The west edge of the excavation was so close to the power poles on the west side that there was a danger that the earth might give way, and possibly cause the poles and the lines to fall into the trench.

and even threatened at one point to enjoin further construction near the lines in question. Its version of the facts was that it had told Kensington that it would not de-energize or move those lines unless the contractor requested such action. Since no request was made, APS argues that it did not receive actual notice of the immediacy of the danger. The contractor's version, which we must now accept, was that the APS representative said there was nothing APS could do about the danger because it could not discontinue electrical service to its downstream customers and that, therefore, the contractor concluded that the appropriate action was to continue with the project, being careful to keep the crane away from the lines. There was also evidence that promptly after Grant's death APS re-routed the lines, thus establishing the existence and feasibility of obviating the danger. Evidence of such remedial measures is ordinarily excluded, but is admissible for a variety of other purposes. See Rule 407, Arizona Rules of Evidence, 17A A.R.S.; 1 M. Udall & J. Livermore, Law of Evidence § 87, at 194–96 (2d ed. 1982). APS has not claimed that the court erred in admitting evidence of these remedial measures.

Under either view of the evidence, the jury could have found the danger foreseeable and APS negligent for failing on its own initiative to remedy that danger. See Restatement (Second) of Torts §§ 447, 449 (1965). See also Annot., Electric Power Company—Liability, 69 A.L.R.2d 93, 97, 98 (1960). The editor extracts the following principles of law from the cases cited in the annotation:

> If it was apparent that danger to someone having a right to be near the wires existed, the [electric power] company may be held liable; if the likelihood of such danger was not apparent, liability will generally be denied.
>
> . . . . .
>
> Where it is or should be evident to a power company that a dangerous condition with regard to its wires exists, it is generally held a question for the jury as to whether the company has taken rea-

sonably prompt measures to eliminate the danger.

■ This rule obtains notwithstanding the contractor's alleged failure to take precautions to protect its workmen. See Restatement (Second) of Torts §§ 447, 449 (1965). The foreseeable, subsequent negligence of others is not a defense if the negligence of the defendant has also been one of the causes of the accident. Id.; Brand v. J.H. Rose Trucking Co., 102 Ariz. 201, 205, 427 P.2d 519, 523 (1967); City of Phoenix v. Camfield, 97 Ariz. 316, 321, 400 P.2d 115, 119 (1965). Further, while APS might not have foreseen that the injury would come about while a new crane, no more dangerous than the old, was used to set piles, it is uncontroverted that APS knew that a crane would operate on the east bank of the excavation and that there was a wider excavation at this point in the project. A party is not insulated from liability merely because it has not foreseen the exact manner in which the injury eventually occurs. See Restatement, supra § 435; W. Prosser, Law of Torts § 43, at 268–70 (4th ed. 1971).

In this case, then, the jury could find that APS failed to take precautions commensurate with the dangers reasonably to be anticipated. Mason v. Arizona Public Service, supra; Cronk v. Iowa Power & Light Co., 258 Iowa 603, 611–12, 138 N.W.2d 843, 847–48 (1966).

Accordingly, we hold that, when viewed in the light most favorable to sustaining the verdict, the evidence was sufficient to support a verdict against Arizona Public Service, and the trial court did not err in refusing to direct a verdict for APS.

## THE CONTRIBUTORY NEGLIGENCE ISSUE

One of the main issues raised in this appeal is whether the trial court erred in refusing APS' proposed instructions on contributory negligence. Grant argues that there was no evidence of contributory negligence and that APS' defense theory was essentially assumption of the risk, which

was the subject of instructions to the jury. The court of appeals held this case did present an issue of contributory negligence and that the trial court therefore erred in refusing the instructions. We disagree.

The essence of APS' argument on the contributory negligence issue is that:

Koy Grant, plaintiff's decedent, was aware that the power lines were energized, . . . that contact . . . would be very dangerous, and he nevertheless worked with the crane so close in proximity to the power lines that contact occurred resulting in his death . . . .

Of course, APS does not contend that Grant, himself, was working "with the crane" in the sense that he was operating it or was responsible for its movements or placement. The argument simply is that Grant was aware of the position in which the crane was placed, of the location of the power lines, that they were energized, that they carried high-voltage electricity, and that if the crane came in contact with the power lines electricity would be transmitted to everyone in contact with a conductor. The record clearly supports these factual positions.

Kensington's supervisor also had told the crew that he had asked APS to de-energize the lines and that APS had said nothing could be done. He therefore instructed his crew to be careful working with the crane in order to keep it from coming into contact with the power lines. There is no question that the crew, including Grant, understood the danger. Nevertheless, the crew kept working, their "consent" thereby arguably creating an issue of implied assumption of the known risk. *See Hildebrand v. Minyard,* 16 Ariz.App. 583, 585, 494 P.2d 1328, 1330–31 (1972); Restatement (Second) of Torts § 496(C) (1965).

■ However, the trial court did instruct on assumption of risk and the jury did not find for defendant on that issue; or, if it did, it exercised its prerogative to disregard the defense, as it may do in this state with regard to both contributory negligence and assumption of the risk. Ariz.Const. art. 18, § 5; *Chavez v. Pima County,* 107 Ariz. 358,

361, 488 P.2d 978, 981 (1971); *Layton v. Rocha,* 90 Ariz. 369, 370–71, 368 P.2d 444, 445 (1962); *Menendez v. Bartlett,* 125 Ariz. 48, 50–51, 607 P.2d 31, 33–34 (App.1980).

The issue here is whether the facts support instructing the jury on both assumption of risk and contributory negligence. Occasionally, the two defenses overlap. There is considerable authority for the proposition that where plaintiff's conduct in encountering a known danger is unreasonable, it may not only manifest a willingness to assume the risk but it may also violate the objective standards applied to determine reasonable care and thus also constitutes contributory negligence. *See, e.g., Menendez v. Bartlett,* 125 Ariz. at 50, 607 P.2d at 33; *Hildebrand v. Minyard,* 16 Ariz. App. at 586, 494 P.2d at 1331; *Meistrich v. Casino Arena Attractions, Inc.,* 31 N.J. 44, 155 A.2d 90 (1959); W. Prosser, *supra,* at 440–41; Restatement (Second) of Torts, *supra,* § 496(A), comment d; Annot., *Distinction Between Assumption of Risk and Contributory Negligence,* 82 A.L.R.2d 1218 (1962). The above authorities indicate that in such circumstances it may make little difference what the defense is called and *Meistrich, supra,* holds that there is therefore no error in instructing on only one of the defenses since they represent the same basic legal principle regardless of the label used. However, we need not consider here whether this rule applies in Arizona because we hold that there was no evidence to support an instruction on contributory negligence, and therefore the trial court did not err in refusing the instruction.

■ To support an instruction on contributory negligence, APS had to show that Grant's conduct fell below the standard of care of a reasonable person. As noted above, Grant had nothing to do with the placement or operation of the crane, nor with its eventual contact with the power line. He was 20 feet below ground level, working on the pilings. The workmen had been warned to be careful to keep the boom and cables away from the power lines, and there is no evidence that Grant had any

knowledge that care was not being used in this regard. George Ferruccio, engineering inspector for the City of Phoenix, who had the power to shut the job down if he found any undue danger, testified that he, too, was aware of the danger. He had cautioned the crew to stay away from the power lines. He watched the operation of the crane and of the pile driving crew, was aware of the OSHA requirement of a 10-foot clearance between the crane boom and cable and the power line, and felt there was enough clearance so that the operation was not overly dangerous. In light of the undisputed evidence in the record, APS' contention that Grant "was aware that the power lines were energized" and dangerous, and that he "nevertheless worked with the crane so close in proximity to the power lines that contact occurred resulting in his death" is no more than an assertion that Grant was contributorily negligent for reporting to work on the day of the accident and going about his assigned duties with knowledge that if one of his co-employees failed to maintain sufficient clearance between the crane and the power line, then anyone near a conductor of electricity would be in danger. Other courts faced with similar facts have refused to conclude that reporting for or failing to stop work under such circumstances constitutes the type of unreasonable conduct necessary to warrant an instruction on contributory negligence.

In *Chaney v. Brupbacher,* 242 So.2d 627 (La.App.1970), the decedent was electrocuted when the boom of a crane which was being used to unload steel beams from a truck came into contact with overhead power lines. The decedent did nothing himself to cause the contact. The court held:

> The test for negligence is reasonableness. While it may be true that the reasonable man would wish to avoid the known risk here, an employee is not entirely free to do so. He cannot simply decline to do the work, because he would then subject himself to loss of his job, his means of support for self and family. It would not have helped [the decedent] to point out the danger to [his employer], because [the

employer] already knew it. Nor could [the employee] tell the [employer] how to run the job. It cannot be fairly said that [the employee] *elected* to work under the dangerous conditions (the danger not being an intrinsic feature of [the employee's] work). Thus, as we see the question, it is whether the reasonable laborer . . . would quit his job or expose himself to being fired without any immediate prospect of another job, rather than work in the presence of a danger which his job did not necessitate and which he had never previously been called on to tolerate. We simply cannot answer that question affirmatively. We believe [the employee's] conduct measured by the reasonable man standard was not negligent, and the defense of contributory negligence therefore fails.

*Id.* at 632. *Accord Etienne v. Home Indemnity Co.,* 307 So.2d 654 (La.App.1975).

While the words of the Louisiana Court of Appeals are somewhat dramatic, the essence of the holding is simply that a workman is not contributorily negligent for reporting to work on a job which presents a known risk of injury in the event a subcontractor, a fellow employee or someone else does something to cause an accident. If such were the law, then every construction worker at the site in question would have been contributorily negligent; similarly, every member of a construction crew building a bridge or skyscraper, every miner, and hosts of other workmen would be automatically guilty of contributory negligence. We reject such a rule. It is only when the workman in question, himself, has done something to bring about the accident which caused his injury that the question of contributory negligence arises.

> Contributory negligence on the part of the decedent is not established merely by showing that he worked in a place of known danger, *but it also must be shown that his conduct was negligent in the face of the danger.* In other words, the basic test is whether the decedent as a reasonably prudent man was in the exercise of ordinary care in doing *his* work under the circumstances.

*Cronk v. Iowa Power & Light Co.,* 258 Iowa at 614, 138 N.W.2d at 849 (emphasis added) (workman laying water pipe electrocuted by current which arced from uninsulated power line to crane which came into close proximity of line). *See also* Restatement (Second) of Torts § 473, which reads as follows: "If the defendant's negligence has made the plaintiff's exercise of a right or privilege impossible unless he exposes himself to a risk of bodily harm, the plaintiff is not guilty of contributory negligence in so doing unless he acts unreasonably." [3]

■ We acknowledge that the courts have not uniformly agreed on whether the defense of contributory negligence is available to a defendant under circumstances similar to those before us in this case. *See* Annot., *Electric Power Company—Liability, supra.* Nevertheless, we feel that the rule which we here adopt for Arizona is the better rule. Contributory negligence must be based on some conduct by or attributable to the plaintiff which the finder of fact could determine was less than that which would have been adopted by a reasonable person under the same circumstances. It requires, essentially, a finding that the plaintiff was at fault, so that his conduct helped produce his own injury. We hold, as a matter of law,[4] that the defense of contributory negligence may not, however, be applied to a workman whose only contribution to his injury is that he reported for work in the morning.

■ The record here contains no evidentiary support for the contention that Grant's conduct helped cause the accident. In its reply brief, APS argues that Grant failed to wear protective gloves or insulated boots. The court of appeals mentioned these alleged omissions in concluding that *the trial court should have given the instruction* on contributory negligence. However, these omissions were not called to the

trial court's attention when instructions were offered and discussed, nor is there any evidence in the record that the workmen had been instructed to wear such equipment, that it was appropriate for that type of danger, or that APS had recommended its use. Furthermore, APS did not offer any expert evidence that if such equipment had been worn the injury would have been avoided. The argument simply comes too late when made for the first time in appellant's reply brief.

The remainder of APS' argument on Grant's alleged contributory negligence illustrates the very reason why we adopt the rule that contributory negligence must be based on some conduct other than just reporting for work. In arguing that a contributory negligence instruction should have been given, APS describes Grant's allegedly negligent conduct as follows:

> [He] voluntarily engaged in work activities wherein a crane was located within ten foot . . . of an energized [line]; and worked in contact with a metal structure . . . . [He] did not require the use of a trained electrical observer to verify distance between metal apparatus and the power lines; did not require or recommend the use of any insulating material . . .; did not demand the work be ceased until a safer method could be devised; . . . did not recommend the grounding of the metal structure . . .; did not perform the work in a method whereby no one would be touching the metal structure . . .; did not . . . *ad infinitim* [sic].

The answer to this contention has been put as follows:

> [T]he obligation of compliance [with safety precautions required by statute] cannot be that of the [employee] because he has no authority to act for his employer in negotiating with [the utility company] and no authority to bind his employer . . . in an agreement to pay the expenses

---

**3.** Comment c of § 473 gives the following example: "[W]hen a public utility maintains its facilities in a dangerous condition, its patrons *may without contributory negligence* use them although the risk in so doing is obvious and substantial." Thus, mere exposure to the

known danger is not contributory negligence, unless the plaintiff fails to exercise such care as is possible in confronting the danger. *Id.,* comment e.

**4.** *Cf.* Restatement (Second) of Torts § 476.

for any work to be done in [clearing the wires].

*Ringo v. Gulf States Utilities Co.,* 569 S.W.2d 31, 34 (Tex.Civ.App.1978).

■ We disagree with the court of appeals' holding that reasonable men could find that Grant was contributorily negligent for going to work with the knowledge that the crane was in proximity to the power line or for not suggesting that the "work cease until safer conditions were furnished," or for not having refused to work while the crane was moving near the line. In effect, this would enable the jury to find that the workman must give up his job until his employer manages to convince the prime contractor, the landowner, the local utility and others that major safety precautions should be taken different from or in addition to those already undertaken. Such a rule is not reasonable. Common experience tells us that employees will work under dangerous conditions rather than give up their jobs, even though it involves some exposure to serious injury. More simply, we will not find the carpenter negligent for having failed to tell the general contractor how to run the construction project. We cannot close our eyes to the realities of the work place.

## INSTRUCTIONS

■ APS claims that the trial court erred with respect to numerous instructions.[5] The first allegation of error pertains to the following instruction given by the trial court:

Arizona Public Service Company in the distribution of high-voltage electrical current by means of uninsulated lines suspended above the public streets of the City of Phoenix, where the public and others in the performance of their work have the right to and may reasonably be expected to go, is under a duty to safeguard the public against injury arising from its operations to the extent of requiring reasonable care to correct or remove the cause of danger if reasonably foreseeable and known to the company.

A power company must anticipate and guard against events which may reasonably be expected to occur.

APS first complains that the instruction improperly sets forth the degree of care which it must observe. This contention is incorrect. We have previously held that an electric utility must exercise the degree of care which is "commensurate with the danger to be apprehended from contact with [high-voltage] wires or the escape of electricity therefrom . . . ." *Salt River Valley Water Users' Ass'n v. Compton,* 39 Ariz. 491, 495, 8 P.2d 249, 250 (1932), *overruled on other grounds, Macneil v. Perkins,* 84 Ariz. 74, 324 P.2d 211 (1958).

[T]he duty of providing insulation or safeguards for such lines is limited to the points or places where there is reason to apprehend that persons may come in contact with the wire, and the law does not compel electric companies to protect their

5. APS submitted a total of 118 instructions to the trial court. Plaintiff also submitted a large number of requests. Since their publication and approval in 1974, the "Recommended Arizona Jury Instructions" (RAJI) have generally been used in our trial courts. RAJI not only covers instructions of the "stock" variety, but also contains instructions on many substantive issues in various types of cases. One of the objectives contemplated by our order approving the RAJI instructions was to relieve court and counsel from the task of drafting and considering a great number of instructions, thus hopefully producing fewer chances for error in the instruction process. Of course, each party is free to submit additional instructions where the RAJI instructions require correction or supplementation. However, counsel should not

consider themselves free to submit a large number of unnecessary, conflicting or repetitive instructions in the hope that the volume of words may induce error, thus providing "insurance" against an adverse verdict. The trial court has much to do without having to spend precious time in settling the wording of a multitude of instructions which are unnecessary in light of the fairly complete coverage provided by the easily comprehended RAJI instructions.

Hopefully the trial bar will see to it that such problems do not continue to occur. If they do, this court may well consider the submission of so large a number of instructions a waiver of error with regard to the trial court's rulings on any but the most fundamental of such instructions.

wires everywhere, but only at places *where people may legitimately go for work, business, or pleasure;* that is, where they may reasonably be expected to go.

*Id.* at 498, 8 P.2d at 251 (emphasis in original). To this extent, then, the instruction in question is a correct statement of the law and was properly given. But APS next argues, and the court of appeals agreed, that the instruction was incorrectly applied to the facts of this case because the power lines in question were 35 feet above ground level and "the public and others normally have no right to be 35 feet above the ground in close proximity to energized APS power lines without prior notice to APS." We feel that this view is improperly restrictive. The key to the concept of duty and the consequent obligation to use reasonable care is the foreseeability of harm. Thus, we have ruled that the requirement of due care with respect to utilities is "commensurate with the danger to be apprehended." *Salt River Valley Water Users' Ass'n v. Compton, supra.* The argument that APS could not expect people to come into contact with lines 35 feet above ground level is not persuasive. The record contains evidence from which the jury could have found not only that APS could have foreseen, but evidently did foresee that there was danger to the workmen who were legitimately present on the premises. The fact that Grant's electrocution did not come about from direct contact between his body and the lines, but rather through contact between the power line and a cable attached to a crane boom, is irrelevant. APS was well aware that electricity travels through conductive material and that all those in proximity to a conductor which may contact uninsulated lines are within a zone of danger. APS was aware of the use of a crane

at various times and at various points along the length of the project.[6] Whether the lack of knowledge respecting the use of this crane at this location on the date of the accident made the possibility of harm unforeseeable was for the trier of fact. *See Arizona Public Service v. Brittain,* 107 Ariz. 278, 280, 486 P.2d 176, 178 (1971).

■■■ APS then urges that the court erred in instructing as follows:

The power company may exercise reasonable care for the protection of lives of others, and to do that which would give reasonable promise of preserving life *regardless of the difficulty or expense.* In the observance of such duties, the degree of care increases as the danger increases. [Emphasis added.]

Among its multiple attacks on this instruction, APS argues that the instruction "is an improper statement of the law." We agree. The court of appeals correctly noted that the emphasized portion of the instruction has no basis in Arizona law. The "difficulty or expense" in taking preventive measures may be relevant in determining whether the defendant acted reasonably in any particular situation, but the utility is not an insurer against accident or injury to others. *Salt River Valley Water Users' Ass'n v. Compton,* 39 Ariz. at 495, 8 P.2d at 250. We hold, therefore, that the trial court erred in giving this instruction.

However, we do not believe that this error requires or permits reversal. First, APS failed to object to the wording in question; its only objection was that the instruction was an "improper statement of the law." Such a general objection is not sufficient to call the trial court's attention to the precise defect in the instruction and was not, therefore, a sufficient predicate for appeal. Rule 51(a), Arizona Rules of Civil Procedure, 16 A.R.S.[7] Next, the ques-

---

6. According to a summary prepared by APS (plaintiffs' exhibit 22 in evidence), other prior incidents involving contact between cranes and overhead lines had occurred. This evidence was admitted to show notice of the danger. Other issues pertaining to the exhibit are discussed below.

7. The rule provides in part: "No party may assign as error the giving or the failure to give an instruction unless he objects thereto, before the jury retires to consider its verdict, *stating distinctly the matter to which he objects and the grounds of his objection.*" (Emphasis added.)

tion of feasibility was not an issue in the case. APS did not argue that it had failed to take measures to prevent the accident because of either technical or economic unfeasibility. In fact, the evidence showed that the cost of the measures which APS took to shoofly or re-route the lines after the accident was relatively negligible. There was also uncontradicted expert testimony that the lines could have been de-energized. Rather, APS' defense to the negligence charge was primarily directed to the theory that without actual notice that the crane "was going to operate dangerously close to its wires, no further duty to plaintiff existed from APS." [8]

Since the objection to the words in question was not specific, and since the precise issue covered by the erroneous words was not truly in question in the case, the incorrect statement in the instruction does not warrant reversal. Upon the whole charge, the jury was given proper rules to be applied in arriving at a correct decision. *Kauffman v. Schroeder,* 116 Ariz. 104, 106, 568 P.2d 411, 413 (1977); *Arizona Public Service v. Brittain,* 107 Ariz. at 281, 486 P.2d at 179.

■ APS next argues that the trial court erred in refusing its instruction No. 11 on the duty of employers and employees under A.R.S. §§ 23–403, –404. These statutes impose upon employers a duty to provide a workplace free from recognized hazards and require employers and employees to comply with occupational safety and health regulations. The regulations accompanying the proffered instruction pertain to use of cranes near power lines. We believe the trial court was correct in refusing the

instruction. Assuming that at the time of the accident the crane was operated in violation of the 10-foot minimum clearance prescribed by OSHA, that violation was not chargeable to Koy Grant. Grant was not operating the crane, did not participate in directing its operation, was not an employee of the company operating the crane, and had not been assigned to signal the crane or observe clearance of the equipment from the power line. At the time of the accident, he was in a hole, 20 feet below ground level and out of eye contact with the worker directing the crane operator and the crane operator himself. Assuming that Clarke, the job superintendent for Grant's employer, had negligently violated the OSHA regulations, we are cited to no law which would impute that negligence to Grant. The trial court did not err in refusing an instruction which was not supported by the evidence and therefore was not applicable to the facts of this case. *See DeElena v. Southern Pacific Co.,* 121 Ariz. 563, 569, 592 P.2d 759, 765 (1979).

■ APS next contends that the evidence was insufficient to warrant the instruction on wilful and wanton negligence. The court of appeals disagreed, with one judge dissenting from that conclusion. Since the jury did not award punitive damages and we are affirming the award of compensatory damages, any error which might exist in submitting the issue of wanton negligence or in the wording of the instruction itself is irrelevant and need not be discussed.

■ APS further argues that the trial court erred in refusing to give its requested

---

An objection to an instruction on the ground that it is "an incorrect statement of the law applicable to the facts of this case" is insufficient under Rule 51(a). *Sult v. Bolenbach,* 84 Ariz. 351, 355–56, 327 P.2d 1023, 1027 (1958); *Purcell v. Zimbelman,* 18 Ariz.App. 75, 91, 500 P.2d 335, 351 (1972).

8. The difficulty of de-energizing the lines or otherwise obviating the hazard presented by those lines at the site of the accident was at issue in this case only insofar as it concerned the alleged reason why the project superintendent, Clarke, failed to notify APS prior to com-

mencing work with the crane at the particular portion of the jobsite where the accident occurred. Clarke contended that APS' representative told him that the lines could not be de-energized. APS' version of the conversation is that its representative informed Clarke that the lines "could not just be turned off" and that some kind of bypass system would have to be built in order to maintain power to customers served by those lines. The problem or expense of shooflying the lines was not in question. The issue was notice. That issue was properly presented to the jury.

instruction No. 17A, to the effect that any duty to warn owed by it would be fulfilled by the warning given to Grant's supervisor. Assuming, without deciding, that the instruction is a correct statement of the law, there was no error in the trial court's refusal because the warning instruction requested was abstract. The workmen were warned. The case turns not on failure to warn, but on failure to take action to prevent injuries which could be foreseen despite the crew's knowledge of danger.

■ APS then claims that the court erred in refusing its instruction No. 99, which postulated that APS would not be liable "to members of the public" if the condition which caused the injury was "known or obvious to such persons." The authorities relied upon by APS for this contention are *Pruett v. Precision Plumbing,* 27 Ariz.App. 288, 554 P.2d 655 (1976), and *Citizens Utility v. Livingston,* 21 Ariz.App. 48, 515 P.2d 345 (1973). Both of these cases concern situations in which liability was sought to be imposed on owners or occupiers of land under Restatement (Second) of Torts § 343 (1965). These principles are inapposite to the situation before us, which involves the duty of a utility to take measures to prevent injury to workmen foreseeably endangered by uninsulated power lines. Even in premises cases there is liability where the possessor of the land might reasonably expect that invitees will be unable to protect themselves against the danger. *Pruett v. Precision Plumbing,* 27 Ariz. App. at 290, 554 P.2d at 657.

■ APS then complains of the court's refusal of its requested instruction No. 106, which would have informed the jury that APS' compliance with the National Electric Safety Code satisfies the "minimum construction and maintenance standards applicable to the construction and operation" of a utility. Ordinarily, a utility's compliance with codes is some evidence of due care. *Cronk v. Iowa Power & Light Co.,* 258 Iowa at 612, 138 N.W.2d at 848. However, this requested instruction is abstract and not relevant to the facts here under consideration. There was no claim that the lines were built too low to the ground or had been allowed to sag, nor that any other feature of general construction or operation of the power lines failed to comply with the code. The issue, rather, was whether APS had failed to take measures to de-energize or re-route the lines when it knew or should have known that there was danger to workmen in the area. APS did not provide the trial court—or us—with any citation to a portion of the code which would apply under the circumstances of this case. The refusal of the instruction was therefore proper.

■ APS next complains that the trial court gave plaintiffs' requested instruction 22, which read as follows:

If a party does not present evidence which is available to him or it, which he would naturally be expected to bring before the court, and which is not available to the other party, you may infer, if it seems reasonable to you to do so, that this evidence would have been unfavorable to him.

The only objection made by APS at the trial was that there was "nothing in this trial that occurred which would justify giving that instruction." APS' representative at the trial was Mr. Cocanour, a managing agent of APS. He sat at APS' table throughout the trial and had been listed as a witness. Mr. Cocanour was called for cross-examination by plaintiff. APS then advised the court that it was deferring direct examination of Mr. Cocanour and would examine him later. It never called him to the stand. In addition, in its answers to interrogatories, APS had named over 100 witnesses, including several electrical engineers. Only two witnesses were called.

Where a party fails to call a witness under his control, . . . or where he fails to call a seemingly available witness, whose testimony he would naturally be expected to produce if it were favorable to him, it is not improper for counsel on the other side, in argument, to comment on such failure.

*Ray Korte Chevrolet v. Simmons,* 117 Ariz. 202, 208, 571 P.2d 699, 705 (App.1977). Since APS made no objection to the instruction other than the lack of factual support, the principle of the *Korte* case concerning propriety of argument is equally applicable to the propriety of instructing on the subject.

## EVIDENTIARY ISSUES

■ APS complains of three evidentiary rulings by the court below. The first objection is directed toward plaintiffs' failure to identify trial exhibits with sufficient specificity. APS alleges that plaintiffs made sweeping, broad descriptions of the contents of exhibits.[9] Thus, APS claims that it was unable to review the exhibits before trial in order to make meaningful objections or to discuss them with its witnesses before they were examined about them. The matter was brought to the trial court's attention at the beginning of the trial. The court discussed the problems with counsel and imposed specific corrective measures to be taken by plaintiffs' counsel. The trial judge is vested with great discretion in the conduct and control of the trial. *Packard v. Reidhead,* 22 Ariz.App. 420, 423, 528 P.2d 171, 174 (1974); *Hales v. Pittman,* 118 Ariz. 305, 313, 576 P.2d 493, 501 (1978). APS has not claimed any specific prejudice which occurred because of its alleged unfamiliarity with the exhibits used by plaintiff and our review of the record indicates that APS' examination and cross-examination of witnesses with regard to plaintiffs' trial exhibits was thorough. We find no abuse of discretion in the trial court's ruling with regard to plaintiffs' lack of specificity in describing exhibits in the pretrial statements required by Rules VI(a)(1), (6) of the Uniform Rules of Practice of the Superior Court and Rule XVI(c)(1), (6) of the rules relating to Maricopa County.

■ APS then argues that the court erred in admitting plaintiffs' exhibit No. 119. This exhibit constituted APS' financial statements, showing assets in the area of $1,700,000,000, a fact mentioned by plaintiffs' counsel during final argument. Of course, a defendant's financial statements are irrelevant in the ordinary case, but are admissible to show wealth or financial status of the wrongdoer where an issue regarding punitive damages is submitted to the jury. *Nielson v. Flashberg,* 101 Ariz. 335, 341, 419 P.2d 514, 520 (1966). Since an issue of punitive damages was submitted to the jury in this case, the trial court admitted the evidence pertaining to defendant's financial status. As noted above, the jury did not assess punitive damages and, therefore, we have not considered the propriety of submission of that issue. We note, however, that even if the punitive damages issue, and thus the financial evidence, should not have been permitted, the record does not support a conclusion that the compensatory damage verdict was "tainted" by the jury's knowledge of defendant's worth. The compensatory damages, although substantial, do not appear excessive. Defendant has not raised that issue on appeal. It is common knowledge that Arizona Public Service is the largest utility in the state. It serves much of the state, including the City of Phoenix, where the trial was held and the jurors resided. We must assume that, even in the absence of information showing APS' exact wealth, the jury would have been well aware that the company to which they pay their monthly utility bills is a very large corporation with hundreds of millions of dollars in assets.

## THE "PRIOR ACCIDENTS" ISSUE

■ APS objected to the admission of plaintiffs' exhibit No. 22. The exhibit is a letter from APS' senior safety analyst to APS' safety supervisor, containing a summary, by type and number, of accidents which occurred through contact with APS' energized power lines for the years 1972 through 1974. Examination of the exhibit shows that some of the 124 incidents described did involve contact between a crane and an overhead energized power line. These incidents were at least prima facie relevant. First, they were relevant because

---

**9.** For example, exhibit 30 was listed as "City of Phoenix files re 15th Avenue storm job."

the list was part of the information which APS had compiled and which went into the formulation of APS' safety program applicable to construction situations. According to plaintiff, APS had violated its own program standards in this case. Second, the list was relevant to show APS' knowledge of the danger involved in the use of cranes near overhead lines and, thus, to establish that APS' safety department should have foreseen danger in the situation present in this case. The occurrence of other accidents having some degree of similarity to the one under consideration was admissible to prove that the defendant was "aware of something that made [its] subsequent behavior careless . . . ." *See* M. Udall & J. Livermore, *Law of Evidence* § 85, at 188 (2d ed. 1982). Such evidence is relevant to prove "knowledge or notice of [the dangerous] condition, or negligence in allowing the condition to continue." *Burgbacher v. Mellor,* 112 Ariz. 481, 483, 543 P.2d 1110, 1112 (1975) (citing *Slow Development Co. v. Coulter,* 88 Ariz. 122, 125, 353 P.2d 890, 892 (1960)). It is true that many of the other incidents on the summary were not similar to the accident involving Grant and include such things as overhead contacts between power lines and antennae, underground contacts with subsurface lines, and the like. "Other accidents" are usually inadmissible without a proper foundation showing some similarity between the accident under consideration and the prior event. *See Slow Development Co. v. Coulter,* 88 Ariz. at 125–26, 353 P.2d at 892; M. Udall & J. Livermore, *supra* at 189.

█ We are thus faced with the admission of an exhibit which contained information which was relevant but which also contained much information of questionable relevancy absent additional foundation. However, as the court of appeals correctly noted, the only objection made was "irrelevant." Defendant's counsel did not raise the lack of foundation showing similarity and did not make a specific objection to that portion of the exhibit which would not be admissible. General objections, such as "irrelevant, immaterial, and incompetent," are insufficient to raise the issue on appeal. *Tucson Federal Savings & Loan Ass'n v. Aetna Investment Corp.,* 74 Ariz. 163, 173–74, 245 P.2d 423, 430 (1952). An objection that evidence is irrelevant, without specifying "how or why" it is irrelevant, does not raise an issue on appeal where, under any possible circumstance, all or part of the evidence would have been relevant. *See Rush v. French,* 1 Ariz. 99, 126, 25 P. 816, 823 (1874).[10] The purpose of the rule requiring specificity of objection is to enable the adversary to obviate the objection if possible and to permit the trial court to make an intelligent ruling and rectify error if possible. *State v. Hoffman,* 78 Ariz. 319, 325, 279 P.2d 898, 901 (1955). Further, where part of an exhibit contains admissible evidence, and part inadmissible evidence, the court is not under an obligation to separate the "sheep from the goats" and commits no error in overruling the objection. *Cf. Powell v. Langford,* 58 Ariz. 281, 288, 119 P.2d 230, 233 (1941) (requested instruction).

Therefore, we find no error in the admission of plaintiffs' exhibit No. 22. The more important question here, however, pertains to the use of the exhibit during argument by plaintiffs' counsel.

## ALLEGED MISCONDUCT OF COUNSEL IN FINAL ARGUMENT

█ Defendant urges that plaintiffs' counsel was guilty of misconduct during the closing arguments. Numerous incidents of such alleged misconduct are assigned. Essentially, APS' complaints on this issue fall into three categories of improper argument. The first is the argument which plaintiffs' counsel based on exhibit No. 22 and which can best be characterized as drawing improper inferences from evidence admitted at the trial. We acknowledge that during

---

10. This case, decided by Arizona's Territorial Supreme Court, provides an excellent disquisition on the proper mode of raising objections at trial. Its analysis and instructive exhortations to trial counsel retain vitality even though they were made more than 100 years ago. The case is also worth reading for entertainment.

the argument trial counsel is allowed to submit to the jury any reasonable inference which may be drawn from the facts admitted in evidence. *Pelayo v. Bell,* 13 Ariz. App. 418, 419–20, 477 P.2d 537, 538–39 (1970). However, in arguing the punitive damages issue plaintiffs' counsel used the summary of the prior accidents to draw inferences far beyond those which were legitimate. For instance, on several occasions reference was made to "124 overhead serious incidents," to "124 deaths," to "124 acts of negligence" by APS, to the need for a punitive damage award which would prevent the 125th death, and similar comments explicitly pertaining to the contention that APS had been guilty of gross negligence and that the jury should award punitive damages. Under no stretch of the imagination could it be said that exhibit No. 22 contains information indicating 124 deaths, 124 cases of negligence, or even 124 accidents involving contact with overhead lines, and counsel's argument was not a legitimate inference from the evidence.

■ The second category of improper argument by plaintiffs' counsel concerns the interjection of facts which were not in evidence. This, of course, is impermissible. *Heimke v. Munoz,* 106 Ariz. 26, 30, 470 P.2d 107, 111 (1970). An example of this was counsel's comment that the jury should consider that Mrs. Grant had not had a "date" and would not remarry. No evidence supported this speculation and such comments were impermissible, both because they were not supported by the evidence and because evidence of the likelihood of remarriage is irrelevant and therefore inadmissible in a wrongful death case. *See State v. Cress,* 22 Ariz.App. 490, 496, 528 P.2d 876, 882 (1974); *Hing v. Youtsey,* 10 Ariz.App. 540, 543, 460 P.2d 646, 649 (1969).

■ The third category of improper argument which APS calls to our attention pertains to counsel's repeated interjection of his personal views and comments, e.g., "I

knew that [testimony] wasn't true." This type of comment was repeated on several occasions during final argument. It is improper for attorneys to argue their personal beliefs in their client's case. *Frontier Motors, Inc. v. Horrall,* 17 Ariz.App. 198, 201, 496 P.2d 624, 627 (1972).

APS properly preserved the issue by attempting to object during argument, and upon being advised by the court that such objections were not permissible under Rule 51(d), Arizona Rules of Civil Procedure, 16 A.R.S.,[11] waited to be heard at the conclusion of plaintiffs' opening argument. At that time, APS pointed out the specific items to which they objected in the argument and made the appropriate motion for a mistrial. This motion was denied.

We agree with the court of appeals that the argument was improper, constituted misconduct of counsel, and that APS did not waive objection. We disagree with the court's conclusion that "[i]n assessing the total impact of such misconduct together with the other error set forth in this opinion, ... the defendant APS was denied a fair trial." We do not feel that the misconduct during final argument, viewed alone, or in conjunction with the improper wording of the instruction setting forth APS' required standard of care,[12] are sufficient to enable us to conclude that the trial court erred in denying APS' motions for a mistrial and for a new trial.

■ The granting or denial of a new trial on the grounds of misconduct of counsel is a matter within the trial court's discretion. *Mayo v. Ephrom,* 84 Ariz. 169, 172, 325 P.2d 814, 816 (1958). A new trial on grounds of misconduct is never granted "as a disciplinary measure but only to prevent a miscarriage of justice.... or, as stated in our Rules of Civil Procedure, Rule 59(a), 16 A.R.S., for a cause 'materially affecting [the] rights ...' of the aggrieved party." *Zugsmith v. Mullins,* 86 Ariz. 236, 238, 344 P.2d 739, 740 (1959) (citation omitted).

11. The rule reads as follows: "Interruption of counsel in argument will not be permitted except for the purpose of raising a question of law."

12. *See supra,* p. 519.

■ In deciding whether the trial court abused its discretion by denying APS' motion, the prime factor to consider is whether the record clearly establishes that the improper conduct caused the jury to return a verdict which was the result of passion and prejudice. *See Frontier Motors, Inc. v. Horrall,* 17 Ariz.App. at 201–02, 496 P.2d at 627–28. From the bare record here we cannot make an independent finding that the verdict was influenced by any prejudice engendered by the improper conduct. We note that the main thrust of the improper argument pertained to exhibit 22 and was specifically and explicitly directed to the question of punitive damages. If the jury had agreed with plaintiffs' counsel that exhibit 22 established that APS negligently caused 124 deaths or serious injuries through contact with APS' power lines, they would undoubtedly have done what counsel suggested—prevent the 125th by awarding punitive damages. Their rejection of this demand is an indication that they were aware that the argument was unsupported. Conflicting inferences to be drawn from items in evidence, such as exhibit 22, are often the subject of argument and it is often the case that opposing counsel have radically divergent views of what inferences may be legitimately drawn from the facts. On these questions, the common sense of jurors is our best protection. Admittedly, the argument went beyond the boundary of legitimate inference and into speculation unsupported by the evidence. However, this is immediately apparent from looking at exhibit 22 and was called to the jury's attention by defense counsel in his argument. It is difficult under the facts of this case to conclude that the jurors were misled by the argument, especially when they refused to award plaintiff the punitive damages for which the argument was the explicit predicate.

We have also reviewed the record to determine whether the improper argument might have caused the jury to award more in compensatory damages than was fair and reasonable. However, the verdict is well within the boundaries of reason. At the time of his death, Grant was 26 years of age, gainfully employed, with earnings of $27,000 a year for the two years before his death. He left two young children and a wife who was so profoundly upset by his death that she required psychiatric treatment. There was uncontroverted evidence that Grant was a skilled, diligent and ambitious workman, that he worked overtime and weekends, at various types of work in order to increase his earnings. There was testimony that because of his skill and diligence he was in line for promotion and could expect various business opportunities. The evidence indicated that the items of special damage, including loss of earnings and earning capacity, were approximately $500,000. Under these circumstances, we conclude that the experienced trial judge did not abuse his discretion in concluding that the misconduct relating to exhibit 22 did not prejudice defendant by increasing the compensatory damages. We also find no evidence that the jurors were misled or prejudiced by the remark that Ms. Grant would not remarry. Though the issue of remarriage is inadmissible in Arizona, such common sense questions are often the subject of speculation in the jury room and, in the absence of even an arguable injustice with respect to the amount of damages, we must conclude that the jurors were not prejudiced by counsel's speculations on the subject.

■ One further factor compels the conclusion that the misconduct does not warrant reversal. In those few cases in which the appellate court has concluded that the trial court abused its discretion in denying a motion for mistrial or new trial grounded upon a claim of misconduct, almost invariably the misconduct has been combined with other, serious error, the cumulative effect of which is to compel the conclusion that there was prejudice.

> Ordinarily, we are most anxious to defer to the conclusion of the trial judge in determining whether he has abused his discretion. This is so because of his greater opportunity and advantage to observe all the parties and witnesses involved.

But such an advantage does not exist where there is a question whether the jury was properly instructed on the law. The trial judges and this court stand on relatively similar levels in determining such an issue.

*County of Maricopa v. Maberry,* 555 F.2d 207, 223 (9th Cir. 1977) (reversing because of the combination of an erroneous instruction on a fundamental issue, and counsel's misconduct in asking a grossly improper question). *See also Elledge v. Brand,* 102 Ariz. 338, 429 P.2d 450 (1967) (granting a new trial). In *Elledge,* there was both misconduct during final argument and admission of highly prejudicial evidence, consisting of a letter to the State Department of Liquor Licenses and Control which suggested that defendant's bar was a meeting place for homosexuals. In the case at bench, the court of appeals found that the "total impact" of misconduct by plaintiffs' counsel, when combined with the other errors set forth in their opinion, denied APS a fair trial. We have found no substantial other error and conclude that the trial court did not abuse its discretion in finding that the misconduct of plaintiffs' counsel did not deny APS a fair trial.[13] In reaching this conclusion, however, we do not underestimate the problem. Final argument is no place for departing from the record, drawing illegitimate inferences, arguing facts not in the record or stating counsel's personal conclusions. The trial court should give counsel wide latitude in making arguments, should use Rule 51(d) to minimize interruptions, but should feel free to entertain objections on legal issues which may be raised under that rule,[14] and should impose restraints upon counsel once it appears that argument is proceeding past legitimate boundaries.

It is difficult for us to express adequately our displeasure with the type of argument shown in this record. Wisely, the law does not permit the judgment to be reversed as a disciplinary measure. *Zugsmith v. Mullins,*

*supra.* If that which counsel sought by the improper argument—an award of punitive damages—had resulted, we would have no hesitation in concluding that the misconduct probably influenced the jury. If the compensatory damages verdict appeared at all excessive, we would reach the same conclusion. If, in the absence of any of the foregoing factors, the trial court had nevertheless decided in its discretion that there was prejudicial misconduct, we also would have no hesitation in affirming. In the absence of any of this, we cannot conclude from the bare record that the misconduct influenced the result and must therefore affirm despite the impropriety.

The opinion of the court of appeals is vacated and the judgment of the trial court is affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.

## SUPPLEMENTAL OPINION

FELDMAN, Justice.

Arizona Public Service has directed its motion for rehearing solely to that portion of the opinion dealing with misconduct of counsel. In addition, many prominent members of the trial bar in this state have sought and been granted permission to appear as amici in support of the motion for rehearing. In view of the important issues raised and because of what appears to be some misunderstanding of our holding on the question of misconduct, we have decided to supplement the opinion.

The arguments advanced by APS and the amici may be summarized as follows:

1. The opinion adopted a "new rule" to the effect that misconduct is not ground for reversal unless the record clearly establishes the verdict arises from passion and prejudice. This, it is claimed, improperly creates a presumption that serious acts of misconduct did not prejudice the verdict.

---

13. This was the main argument advanced in APS' Motion for New Trial.

14. The objection that counsel was arguing facts not in the record is an objection "raising a question of law" under Rule 51(d).

2. Such a "presumption" should not be indulged when the trial court has "abdicated its responsibility" to control counsel's conduct; the burden should be upon the party guilty of misconduct to establish that there was no prejudice.

3. The opinion has established a rule that an order denying a motion for a new trial made upon the ground of misconduct is to be reversed only when that misconduct was accompanied by other, serious error.

4. The consequences of adopting the "new rule" or "presumption" will result in lowering the "moral tone" of the bar, lessening the deterrent against misconduct by counsel, inviting the trial bar to cross the line of propriety and making trial courts reluctant to exercise their power to control misconduct.

5. Explicitly argued in APS' memorandum and implicit in the brief of the amici is the further contention that this court should rule that reversal in the absence of prejudice is appropriate where the reason for so doing is to ensure ethical practice by the trial bar.

## THERE IS NO "NEW RULE" CREATING A PRESUMPTION OF HARMLESS ERROR

Omitting some of the citations, we reemphasize the points made in our original opinion (at 524). The grant or denial of a motion for a new trial on the ground of misconduct is a matter within the trial court's discretion; in exercising that discretion, the trial court must decide whether the misconduct has materially affected the rights of the aggrieved party.

■ In its motion for rehearing, APS argues that we should hold that when misconduct "tends" to influence the verdict improperly, a new trial should be granted. We disagree. By definition, most acts which constitute error or misconduct are of the type which tend to exert an improper influence on the result; it is for that reason that they are considered to be error or misconduct. If a mere tendency to influence the result were the test, then almost

every trial court error would be ground for reversal. The law is to the contrary.

> No error ... in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict ... unless refusal to take such action appears to the court inconsistent with substantial justice. *The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.*

Rule 61, Rules of Civil Procedure, 16 A.R.S. (emphasis supplied). A similar rule is contained in the Arizona Constitution. Ariz. Const. art. 6, § 27.

These principles are reflected in the case law. Reversal will be required only when there has been error or misconduct and it appears probable that the misconduct "actually influenced the verdict." *Sanchez v. Stremel,* 95 Ariz. 392, 395, 391 P.2d 557, 559 (1964). A new trial will be granted only for a cause "materially affecting the rights ... of the aggrieved party." *Zugsmith v. Mullins,* 86 Ariz. 236, 238, 344 P.2d 739, 740 (1959).

■ We decline to depart from this rule and, indeed, are constrained to follow it by Rule 61, *supra.* Thus, the issue before us is how to determine whether the misconduct influenced the decision. APS argues persuasively that this court cannot be certain that the misconduct did not influence the jury and that since the denial of a motion for a new trial imports greater finality than an order granting a new trial, any doubt regarding prejudicial effect should be resolved in favor of the party aggrieved. *See Sadler v. Arizona Flour Mills Co.,* 58 Ariz. 486, 121 P.2d 412 (1942). We agree with both contentions. At the time the original opinion was written, this court was not certain that the misconduct had not influenced the verdict. We are no more certain now. If we had the initial determination of this issue and were to apply the *Sadler* rule, we might well grant APS' motion for a new trial on the ground of misconduct.

It is at this point that the amici misconstrue the meaning of the opinion. We did not hold that the record must clearly establish that the improper conduct caused the jury to return the verdict. The initial determination of this issue is to be made by the trial court. It is a factual determination and no presumption of prejudice or the lack of prejudice should be applied, except, of course, if the misconduct is serious, the *trial judge* should resolve any doubt regarding prejudice in favor of the party aggrieved. *Sadler v. Arizona Flour Mills Co., supra.* Our language from page 35 of the original opinion does state that the "prime factor to consider is whether the record establishes that the improper conduct caused the jury to return a verdict which was the result of passion and prejudice." But the first half of that sentence states explicitly that this rule is to be applied by us "[i]n deciding whether the trial court abused its discretion by denying ..." the motion for a new trial.

Thus, no "new rule" has been adopted at all. The trial court must make a factual determination of whether the misconduct has affected the result; as with most factual determinations, this is a matter within its discretion. We do not reverse that discretionary, factual finding unless the record clearly establishes that the trial court was incorrect. This analysis is not new or peculiar to motions for a new trial on the ground of misconduct; it is the usual rule applied to all discretionary, factual findings by the trial court. Its specific application to motions for new trial is set forth in *Taylor v. Southern Pacific Transportation Company,* 130 Ariz. 516, 637 P.2d 726 (1981). APS claims that the decision in the case at bench is directly contrary to the *Taylor* case, but we think quite the opposite is true. In *Taylor,* we affirmed the grant of a new trial upon the trial court's finding that the misconduct had procured a verdict which was the result of "passion and prejudice on the part of the jury." In this case, we affirm the trial court's finding that the misconduct had not influenced the result. The reasons given to justify the result in *Taylor* are the reasons which justify the result here. As we said in *Taylor:*

In reviewing a decision to grant a new trial, an appellate court will not reverse the trial court unless there is a clear abuse of discretion. The reason for the broad discretion granted trial judges in these matters has been stated as follows:

> "The judge sees the witnesses, hears the testimony, and has a special perspective of the relationship between the evidence and the verdict which cannot be recreated by a reviewing court from the printed record. For this reason he is accorded broad discretion in granting a new trial. * * *
>
> \* \* \* \* \* \*
>
> "Due to his unique position, the trial judge has become the primary buffer against unjust verdicts. He performs an indispensable function without which our system of justice could not hold out the promise of [a] uniform application of the law."

*Taylor v. Southern Pacific Transportation Company,* 130 Ariz. at 521, 637 P.2d at 731 (quoting from *Reeves v. Markle,* 119 Ariz. 159, 163, 579 P.2d 1382, 1386 (1978)).

The trial court heard extensive argument on the misconduct issue, and was made aware in some detail of each instance of alleged misconduct. Nevertheless, the court found no prejudice, and our task was merely to determine whether that finding by an experienced trial judge was an abuse of discretion.

■ The term "abuse of discretion" is one which is often used by appellate courts but seldom defined. One possible definition is that a trial court acts within its discretion when it reaches a conclusion which pleases the appellate court, and abuses its discretion when the conclusion is one with which the appellate court disagrees. We consider this definition unsatisfactory. We set forth in the original opinion, and repeat, those factors which seem relevant for use by the appellate court in determining in this and similar cases whether there has been an abuse of discretion by the trial court. With some additions, they are:

1. Where there has been an error of law committed in the process of reaching the discretionary conclusion. *See Brown v. Beck,* 64 Ariz. 299, 169 P.2d 855 (1946).

2. Where the discretionary conclusion was reached without consideration of the evidence. *Knollmiller v. Welch,* 128 Ariz. 34, 623 P.2d 823 (App.1980).

3. Where other, substantial error of law has occurred as part of or in addition to the misconduct, we may conclude that the trial court abused its discretion. Those few Arizona cases in which the trial court's denial of a motion for a new trial on the ground of misconduct has been reversed on appeal fit into this category. *See County of Maricopa v. Maberry,* 555 F.2d 207 (9th Cir. 1977) (applying Arizona law); *Elledge v. Brand,* 102 Ariz. 338, 429 P.2d 450 (1967); *Sisk v. Ball,* 91 Ariz. 239, 371 P.2d 594 (1962). These cases involved introducing new theories of liability (*Sisk*), bringing implications of defendant's homosexual activities before the jury (*Elledge*), and erroneous instructions on an important legal issue in addition to counsel's misconduct (*Maberry*). Contrary to the fear expressed by the amici, we did not hold that the trial court must find other, serious error before misconduct may justify a new trial. We do hold that the presence of such other error, combined with misconduct, may well enable us to conclude that the trial court abused its discretion in denying the motion, even though either factor, considered alone, might not be sufficient.

4. Our review of the record may convince us that there is no substantial basis for the trial court's discretionary finding. However, this is not a holding that the trial court must find the record affirmatively establishes prejudice, but merely a rule that the appellate court may find an abuse of discretion if the record fails to provide substantial evidence to support the trial court's finding. This is not a new rule. *Martin v. Rossi,* 18 Ariz.App. 212, 501 P.2d 53 (1972). Thus, as we indicated in the original opinion, if the improper argument which was explicitly directed toward punitive damages had been successful, or if the compensatory damage award had appeared unreasonable, we could then find that the record did not provide substantial support for the trial court's finding of lack of prejudice. *Cf. Stone v. Foster,* 106 Cal.App.3d 334, 355, 164 Cal.Rptr. 901, 913 (1980) (punitive damages awarded); *Koufakis v. Carvel,* 425 F.2d 892 (2d Cir. 1970) (compensatory damages excessive). However, neither of these factors is present, and we found and find no basis for concluding that the record establishes that the trial court was incorrect in its factual determination.

We are urged to follow a line of cases which hold that prejudice must be presumed even when it cannot be demonstrated because the trial court failed to admonish the jury to disregard the misconduct. These cases, however, were situations in which, for one reason or another, the trial court seems to have lost control over the entire trial, so that the reviewing court must conclude that the trial proceedings were a virtual mockery of the concept of a fair and impartial trial. In *Love v. Wolf,* 226 Cal.App.2d 378, 38 Cal.Rptr. 183 (1964), the appellate court detailed counsel's misconduct from opening statement through final argument, characterizing the misconduct as "egregious beyond any in our experience or that related in any reported case . . . ." *Id.* at 382, 38 Cal.Rptr. at 184. The court found the trial judge's "loss of . . . control" of the case "very puzzling." *Id.* at 391, 38 Cal.Rptr. at 190. *See also Simmons v. Southern Pacific Transportation Company,* 62 Cal.App.3d 341, 133 Cal.Rptr. 42 (1976). Our review of this record does not permit the conclusion that the trial judge "lost control" of the case, nor that the court permitted counsel to engage in conduct which precluded a fair trial. Hopefully such a case will not arise; if it does come before us, we shall have no hesitancy in finding that denial of a motion for a new trial was an abuse of discretion.

We are left here with a case in which the record could justify either a conclusion of prejudice or no prejudice. Therefore, the rule of *Taylor v. Southern Pacific Transportation Company, supra,* is applicable, and

the trial court's discretionary finding must be affirmed. Thus, as we previously indicated, if the trial court had granted a new trial, we would have no hesitancy in affirming. On the other hand, since the record also supports the contrary finding, we must affirm the order denying a new trial, unless some reason exists for departing from the usual rule. APS claims that the need to deter misconduct by counsel in order to ensure ethical practice by the trial bar provides an adequate reason to depart from the usual rule.

## THE DISCIPLINE QUESTIONS

APS states that the "effect of the court's opinion is to promote disrespect for the judicial system." In essence, the argument is that by allowing counsel to "get away" with misconduct, we will encourage others to indulge in such actions in order to attract clients. The amici urge that lawyers with contingent fee contracts will be given a "powerful incentive . . . to increase the size of [their] fee by inflaming the jury with improper argument." Thus, we are asked to safeguard the integrity of the system by departing from the traditional rule that the verdict will not be disturbed merely to punish the lawyer. *Zugsmith v. Mullins,* 86 Ariz. 236, 237, 344 P.2d 739, 740 (1959). This rule has most recently been expressed in the following words: "Misconduct alone will not cause reversal, as a new trial should not be granted to punish counsel." *State v. Cannon,* 133 Ariz. 216, 650 P.2d 1198 (1982) (quoting *State v. Ramirez,* 116 Ariz. 259, 265, 569 P.2d 201, 207 (1977)). As APS points out, *Zugsmith* did not involve serious misconduct; however, *Cannon,* a first degree murder case in which the prosecutor failed to reveal a substantial change in the condition of the murder weapon, involved very serious misconduct.

In our first opinion, we declined to depart from the *Zugsmith* rule. APS argues that our decision declares ". . . open season on integrity in our judicial system and [exposes] it to the rape and repetitive ravages of those few who are willing to compromise truth in search of ever increasing verdicts. If the tactic is successful, it is tempting to repeat it again and again."

█ Dismayed as we are by such an Orwellian prospect, we are not persuaded. Where the trial court has determined that the trial was fair and the result not influenced by the misconduct, then reversal to punish the lawyer has the necessary effect of punishing the client in order to discipline the profession. Even if such a procedure were permissible, it should certainly be avoided unless absolutely necessary. APS and the amici claim such a procedure is necessary here. They cite several other cases which allegedly prove that the lawyer in question has established a pattern of misconduct; they argue that misconduct in this case is not an isolated episode prompted by the pressure of the case, zeal for the client's cause, the tactics of the opposition or any of the other factors which occasionally lead even ethical trial lawyers to conduct themselves improperly. This lawyer, they argue, is among the small group who customarily use improper techniques and can only be deterred by the most draconian of measures.[1] The vice in this argument is that this court cannot make a summary adjudication with regard to any lawyer's customary method of practice in or out of court. We think it is obvious that the lawyer has the right to be heard with regard to the occurrences in this and the other cases.

Trial of hotly contested issues such as those presented by this case produces few candidates for canonization on either side. Circumstances not apparent on the face of the record must often be considered. Lawyers are entitled to be heard before being branded as unethical practitioners.[2]

1. If, as alleged by APS, the lawyer in question has been guilty of impropriety in previous cases, we have difficulty in understanding why the bar has waited to initiate those procedures which are designed to assist in the discipline of

the profession. We do not mean by this to recommend that any action is necessarily indicated against this particular lawyer.

2. Interesting examples of reasons for this con-

More important, we disagree with APS' assertion that by affirming for lack of prejudicial error we are "... declaring open season on integrity ...." We do no such thing. Where misconduct has affected the verdict, the verdict should be set aside. Where it has not affected the verdict, the verdict should stand. The way to deal with those who "constantly practice close to the line" (Amici Brief) or whose "repetitive" transgressions put them among "those few who are willing to compromise truth in search of ever increasing verdicts" (APS' wording) is to follow the disciplinary procedures which are contained in the rules of this court. Since we must sit in final decision-making capacity with regard to breach of disciplinary rules, we do not ordinarily initiate disciplinary proceedings where the facts which may justify such action are within the knowledge of those who have both the opportunity and means to do what the rules require and permit in such cases. If the lawyer here merits discipline, a question on which we have formed and express no opinion, the forum for that is provided in the rules.

With the foregoing clarifications, the original opinion will stand. The motion for rehearing is denied.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.

clusion are present in this case. For instance, the opinion of the court of appeals indicates that APS argues that the erroneous admission of exhibit 22 was compounded by use of the contents of that exhibit during argument by plaintiffs' counsel. Indeed, APS does argue in its brief (p. 33) that counsel "made the most of exhibit 22, especially in final argument." The court of appeals states (slip op. at 9) that it "find[s] error in the manner in which plaintiffs' counsel used the contents of the exhibit in argument to the jury." Our opinion calls counsel to task for the argument that he "based on exhibit No. 22." Exhibit 22 is a letter from an APS employee pertaining to incidents where contact had been made with the company's power lines. It contains nothing which would support an argument about 124 serious accidents. However, as plaintiffs' counsel points out, exhibit No. 22 was never mentioned in final argument; the argument specifically referred to exhibits 23 and 29. These exhibits do show 124 previous accidents resulting from overhead contact and leading to serious injury or death. Although exhibit 22 was not misused, the comments in our original opinion must still stand because, although the exhibits 23 and 29 justify an inference that there may have been 124 accidents of some type, they do not provide a basis for inferences that there

had been 124 deaths, 124 cases similar to the Grant case, or 124 previous negligent acts. To this extent, the argument was improper. In justice to counsel, and supportive of the trial court's finding of no prejudice, we should note that interspersed with the inaccurate comments were comments which properly interpreted the exhibits. (See, for example, Transcript XIV at 50, 66–67, in which counsel finally got the facts straight and indicated to the jury that of the 124 previous incidents, 17 involved crane contacts with overhead lines.) Counsel for plaintiffs also attempts to justify the portion of his argument relating to remarriage by reference to the testimony of the psychiatrist who had treated Mrs. Grant for depressive neurosis caused by her husband's death. Without objection, that psychiatrist testified that Mrs. Grant had not remarried. Counsel did not limit his argument to this comment. He argued that Mrs. Grant "[is] never going [to] get married." Id. at 144. This comment was speculative and injected a damage issue which was not relevant. Nevertheless, it is hardly possible to rule summarily that a statement that someone will never marry is misconduct deserving punishment of both lawyer and client when there are facts in evidence that the person has not married.