728 P.2d 256

Harvey R. McELHANON, Jr., and Doreen T. McElhanon, his wife, Plaintiffs-Appellees Cross-Appellants,

v.

Robert Ong HING and Alice Hing, his wife, Defendants-Appellants Cross-Appellees.

No. 1 CA–CIV 5933.

Court of Appeals of Arizona, Division 1, Department A.

Oct. 1, 1985.

Jack E. Evans, Ltd. by Jack E. Evans, Phoenix, for plaintiffs-appellees cross-appellants.

Daughton, Feinstein & Wilson by Donald Daughton, Allen Feinstein, R. Stewart Halstead, Phoenix, for defendants-appellants cross-appellees.

GRANT, Judge.

This appeal raises the question of whether there is a cause of action against an attorney who, while acting in his capacity as an attorney, engages in a conspiracy to defraud a judgment creditor of his client. A cross-appeal raises the issue of whether a judgment creditor may recover damages in excess of his judgment plus incidental costs as a result of an alleged conspiracy to hinder him from collecting his judgment. Several sub-issues are raised in relation to the main issue on appeal.

### FACTS

#### I.  History of Parties' Relationships.

A detailed history of the facts leading up to this lawsuit is necessary for an understanding of the issues raised on appeal. In the summer of 1970, appellee Harvey R. McElhanon, Jr. (McElhanon), John H. Greer, Jr. (Greer), and Charles Gilbert Harris (Harris) purchased stock in several corporations which operated restaurants. One group of restaurants was acquired through the acquisition of stock in corporations owning the restaurants. The stock of these corporations was placed in escrow as security for payment of the purchase price. Another restaurant, Pinnacle Peak Patio, was owned by the Southwest Restaurants Systems, Inc. (Southwest), a new corporation formed by McElhanon, Greer and Harris. McElhanon and Greer each contributed $85,000 as down payment for the stock of these corporations. McElhanon, Greer and Harris each became owner of one-third of the stock in each of the corporations.

In return for his receiving his stock ownership, Harris agreed to forego dividends from the restaurants until the initial down payment by McElhanon and Greer had been returned to them. A formula was devised whereby Harris would waive $250,000 in dividends, and after that sum was reached, would thereafter participate equally in the dividends. This agreement was reached because Harris was unable to pay his one-third share of the purchase price. Part of this agreement was that if there were no profits Harris incurred no obligation to pay.

#### II.  Maricopa County Cause No. C–249999.

Several months following the purchase of the stock in the corporations, in the fall of 1970, disputes arose among these three shareholders. In May, 1971, John Philip Grace (Grace), the lawyer for the corporations (also the personal attorney of Greer), wrote to McElhanon's attorney requesting that McElhanon sell his interest in the corporations to Greer and Harris. McElhanon declined. In May, 1971, at a corporate meeting McElhanon was not re-elected as an officer of the corporations. At the time McElhanon was primarily responsible for operating the restaurant known as Pinnacle Peak Patio. About that time McElhanon filed suit in Maricopa County Cause No. C–249999 against Harris, Greer, and the corporations seeking both a determination that Southwest and the other corporations were a partnership, not a corporation, and seeking monetary relief: payment of $250,000 based on Harris's prior promise to pay that sum; damages against Greer for maliciously interfering with Harris's obligation to pay that sum, and damages on the grounds that Greer and Harris had committed acts of malfeasance and misfeasance against the corporations.

Grace originally represented the defendants in that action. Shortly after the suit

**390**

was filed Grace began consulting with attorney Robert Ong Hing (Hing) who is the defendant/appellant in this appeal. In accordance with a shareholders' agreement among Harris, Greer and McElhanon, an application for arbitration as to the value of the stock of the corporations was filed and arbitration hearings were held. Harris and Greer eventually retained Hing as counsel for them individually. Apparently on one occasion Grace stated that Hing was hired because Grace had a conflict in representing both Southwest and Greer and Harris personally. Although the record is somewhat confused on this point it is clear that Grace and Hing consulted frequently about matters relating to the lawsuit in cause no. 249999.

In the spring of 1972, an arbitration proceeding determined that McElhanon's one-third stock interest was worth $483,600. An attempt to reduce the arbitration award was unsuccessful.

In September, 1973, a trial was held in cause no. C–249999. Hing represented Greer and Harris in the action. On October 11, 1973, the jury returned a verdict in C–249999 in the amount of $200,000 in favor of McElhanon and against Harris based on Harris's promise to pay that amount from the dividends of the corporation. No relief was given against Greer. The following day judgment was entered on the jury's verdict. On the date the judgment was entered against Harris his interest in the restaurant corporation was the only asset which could be used to satisfy McElhanon's judgment.

It is the sequence of events following the return of the jury's verdict in cause no. 249999 and entry of the judgment against Harris on October 12, 1973, which caused McElhanon to bring the instant action against Greer, Grace and Hing for an unlawful conspiracy to defraud McElhanon's rights as a judgment creditor. McElhanon claimed that as a result of the participation of Greer, Grace and Hing in this sequence of events that his rights as a judgment creditor were rendered worthless, the restaurant corporations became bankrupt,

and, in addition, McElhanon's one-third interest in those restaurant corporations became worthless. Although the record is confused, the main allegation is that, after being informed of the verdict, Greer and Harris went to Hing's office to discuss the matter. During the course of the meeting they apparently expressed a desire to have Greer purchase Harris's stock in the corporations. Hing prepared a sale agreement to that effect. Harris's stock certificate in Southwest was cancelled and a new stock certificate was issued in Greer's name and the transaction was completed by October 13, 1973. McElhanon claims that the transfer of this stock to Greer was fraudulent and was facilitated by Hing and Grace. Because there were outstanding legal fees owed to Hing by Greer and Harris, Hing retained the Southwest stock certificates, the agreement, and the note and assignment as security for his fees. Hing subsequently filed post-judgment motions as well as a motion for a stay which was granted pending a ruling on the post-trial motions.

On October 20th, prior to the order staying execution, McElhanon had a writ of garnishment served against the corporations as garnishee defendants. The writ was timely answered. In the answer it was disclosed that Harris did not own any stock in the corporations and that Greer was indebted to Harris. As a result of this answer McElhanon became aware of the sale of stock from Harris to Greer. McElhanon filed an application for an order to show cause to set aside the sale of stock from Harris to Greer. The order to show cause was dismissed. On November 14, Harris appealed the judgment against him. On the same day Harris, Greer and Southwest signed a promissory note in favor of Hing and his law partner in the sum of $25,000 for fees owed.

III. The Bankruptcy Actions.

On July 26, 1974, Southwest filed a voluntary bankruptcy petition under Chapter XI of the Bankruptcy Act. In February, 1975, Harris filed a voluntary bankruptcy petition. In October, 1976, Greer filed a

voluntary bankruptcy petition. The bankruptcy court ruled that the October 13th agreement was a fraudulent conveyance and that Harris's bankruptcy trustee owned the stock in Southwest.

McElhanon sought a determination in the Harris bankruptcy action that he was entitled to a lien on the stock which Harris had sold to Greer. The law firm of Stockton and Hing opposed McElhanon's claim on the ground that it had a prior right to the stock because of its retaining lien for its fees. The bankruptcy judge ruled in favor of McElhanon. Stockton and Hing appealed that decision to federal district court. The district court reversed the bankruptcy court and ruled that Stockton and Hing's lien was superior to McElhanon's claim based on his writ of garnishment. McElhanon appealed the district court's decision to the Ninth Circuit, which reversed the district court and reinstated the judgment of the bankruptcy court.

While these various actions were being litigated both McElhanon and Hing bid for the stock of Southwest in the reorganization proceedings. McElhanon's bid was accepted by the court. McElhanon paid $700,000 in cash for the new stock and assumed an existing encumbrance on the Pinnacle Peak Patio Restaurant in the amount of $400,000.

IV. The Instant Action (Maricopa County Cause No. C–320360).

McElhanon filed the instant action on September 23, 1975. He amended his complaint on March 14, 1980 to contain four counts. Count 1 was an allegation of an unlawful conspiracy among Harris, Greer, the law firm of Stockton and Hing, Stockton and Hing individually, and Grace to defraud McElhanon as a judgment creditor and to violate certain statutes. Count 2 alleged that the firm of Stockton and Hing breached its statutory duties as a garnishee defendant. Count 3 alleged that Greer breached his statutory duties as a garnishee defendant. Count 4 alleged that Grace breached his duties as a garnishee defendant and that Grace and Greer breached their duties as agents of the garnishee defendants. The court granted Hing's and Grace's motions for summary judgment as to Counts 2 and 4. The court limited McElhanon's damages on Count 1 to the lesser amount of McElhanon's judgment against Harris or the value of Harris's stock in Southwest at the time of service of writ of garnishment upon Southwest, plus McElhanon's incidental expenses in obtaining the stock.

Trial began on July 8, 1980. Several motions for mistrial occurred throughout the proceedings which relate to issues raised in this appeal. The jury deliberated for six days and reached a verdict on August 14, 1980, against Hing and Grace in the amount of $286,120. The jury denied a request for punitive damages. Prior to submitting the case to the jury, the court directed a verdict against Greer. The court did not inform the jury of the directed verdict but allowed the jury to render its decision as to Hing and Grace prior to the jury's deliberations on Greer. Judgment was entered against Hing and Grace in the sum of $286,120 in favor of McElhanon. McElhanon thereafter settled his dispute with Grace and agreed not to execute on his judgment against him. Hing's motions for a new trial and for judgment notwithstanding the verdict were denied and a notice of appeal was filed by Hing. McElhanon filed a notice of cross-appeal from that part of the judgment limiting damages to $286,120 and from the order denying his motion for new trial as to damages only.

Other facts will be set forth in the discussion of the issues to which they relate.

### CAUSE OF ACTION

IS THERE A CAUSE OF ACTION AGAINST AN ATTORNEY, ACTING IN HIS CAPACITY AS AN ATTORNEY, FOR CONSPIRACY TO DEFRAUD A JUDGMENT CREDITOR OF HIS CLIENT?

In connection with the issue as stated, Hing claims that: (1) there is no cause of action for participating in a fraudulent conveyance against one not a party to the

conveyance; (2) there is no civil action for conspiracy in Arizona; (3) an attorney is not liable to an adverse party for actions taken as an attorney for his client.

1. *Is there a cause of action for participating in a fraudulent conveyance against one not a party to the conveyance?* ⸱

2. *Is there a civil action for conspiracy in Arizona?*

■ We disagree with Hing as to his first proposition, that there is no cause of action against one not a party to an allegedly fraudulent conveyance. When a civil wrong occurs as the result of concerted action, the participants in the common plan are equally liable. W. Prosser and W.P. Keeton, *The Law of Torts*, § 46 at 323 (5th ed. 1984). The word "conspiracy" is generally used in connection with imposing vicarious liability for concerted action. *Id.* at 324.

When a claim is labelled "conspiracy," a distinction must be made between a claim based solely on an agreement and on one based upon the acts performed in accordance with the agreement. In *Tovrea Land and Cattle Co. v. Linsenmeyer*, 100 Ariz. 107, 131, 412 P.2d 47, 63 (1966), the Arizona Supreme Court stated, "[t]here is no such thing as a civil action for conspiracy. The action is one for damages arising out of the acts committed pursuant to the conspiracy," citing *Hale v. Brown*, 84 Ariz. 61, 323 P.2d 955 (1958). The thrust of *Tovrea* is that a mere agreement to do a wrong imposes no liability; an agreement plus a wrongful act may result in liability. The *Tovrea* case stated: "The damage for which recovery may be had in such a civil action is not the conspiracy itself but the injury to the plaintiff produced by the specific overt acts." 100 Ariz. at 131, 412 P.2d at 63.

■ In holding as we do, we agree with the reasoning of the Wisconsin Supreme Court as set forth in *Onderdonk v. Lamb*, 79 Wis.2d 241, 246–47, 255 N.W.2d 507, 509 (1977):

"The law of civil conspiracy is ... characterized in this state by the following:

"'It is the established law of this state that there is no such thing as a civil action for conspiracy. There is an action for damages caused by acts pursuant to a conspiracy but none for the conspiracy alone. In a civil action for damages for an executed conspiracy, the gist of the action is the damages.' *Singer v. Singer* (1944), 245 Wis. 191, 195, 14 N.W.2d 43."

The gravamen of a civil action for damages resulting from an alleged conspiracy is thus not the conspiracy itself but rather the civil wrong which has been committed pursuant to the conspiracy and which results in damage to the plaintiff. The resultant damages in a civil conspiracy action must necessarily result from overt acts, whether or not those overt acts in themselves are unlawful.

McElhanon concedes that the fraudulent conveyance, without more, created no liability against Hing since the fraudulent conveyance, but for Hing's additional acts, would have been set aside shortly after it was accomplished and McElhanon would have suffered only minimal damages. McElhanon urges however, that Hing's conduct not only included participating in the fraudulent conveyance, but participation in a conspiracy to destroy McElhanon's right to acquire the Harris stock.

The next question then is whether there was a wrongful act. Hing suggests that a cause of action for participating in a fraudulent conveyance should be limited, as other courts have done, to instances where a creditor has an actual, present lien against a debtor. *Adler v. Fenton*, 65 U.S. (24 How.) 407, 16 L.Ed. 696 (1861); *Hadden v. United States*, 130 F.Supp. 610 (1955); *Lamb v. Stone*, 28 Mass. (11 Pick.) 527 (1831); *see generally*, Annot., "Right of Creditor to Recover Damages for Conspiracy to Defraud Him of Claim," 11 A.L.R. 4th 345 (1982). The principle behind the "lien requirement" rule is that until a creditor obtains a lien, giving him vested or specific rights in the debtor's property, the

debtor is legally free to do what he will with his property. *Adler v. Fenton.* Although McElhanon argues to the contrary, from a factual standpoint it appears clear that the allegedly fraudulent stock transfer between Harris and Greer occurred on October 13, 1973. Since the writ of garnishment was not served until October 20, McElhanon was not a lien creditor at the time of the transfer. *See Menner v. Slater,* 148 Cal. 284, 83 P. 35 (1905). Thus, under the "lien requirement" theory there was no wrong committed against McElhanon.

■ There is another view which holds that a general or judgment creditor does suffer a legal wrong from a fraudulent conveyance. *Celano v. Frederick,* 54 Ill. App.2d 393, 203 N.E.2d 774 (1964); *Smith & Crittenden v. Sands,* 17 Neb. 498, 23 N.W. 356 (1885); *Dalton v. Meister,* 71 Wis.2d 504, 239 N.W.2d 9 (1976) (11 A.L.R. 4th 332). We agree that a lien is not necessary before there is an actionable wrong. Arizona's adoption of the Uniform Fraudulent Conveyance Act, A.R.S. §§ 44–1001 to 44–1013 (UFCA) is particularly persuasive on this point. The UFCA makes such transfers unlawful as against creditors without a lien and even as to creditors without a judgment. We are not relying on the UFCA per se[1] but on the public policy thereby adopted.

■ We agree with the reasoning of the Wisconsin Supreme Court in *Dalton v. Meister,* where the court recognized a cause of action for conspiracy to commit a fraudulent conveyance. The court held that upon passage of the Uniform Fraudulent Conveyances Act, a conveyance to defraud a general creditor became a legal wrong, properly the subject of a suit for civil conspiracy. The cause of action requires a combination of two or more persons who, by some concerted action, accomplish some unlawful purpose or by unlaw-

ful means accomplish some purpose not itself unlawful. The term "unlawful" means not only criminal acts, but includes all willful, actionable violations of civil rights such as a fraudulent conveyance against a general creditor. The court noted that a conspirator, in this instance a bank, is not exonerated from liability because it may not have benefitted from the fraudulent conveyance. We therefore have concluded that a fraudulent conveyance against a judgment creditor is a legal wrong which may be the subject of a complaint for damages arising out of a conspiracy to commit a fraudulent conveyance.

Hing claims McElhanon's remedies were exclusively under the UFCA. The UFCA's remedies are set forth in A.R.S. § 44–1009 and in essence provide alternative rights: (1) The creditor may have the conveyance set aside, or (2) The creditor may disregard the conveyance and execute on or garnish the property in the hands of the fraudulent transferee.

In *Dalton v. Meister* the Wisconsin court further held that the plaintiff-creditor's remedies against the bank, which had helped the debtor to fraudulently transfer his assets, were not limited to those under the UFCA; the tort of conspiracy to commit a fraudulent conveyance entitled the plaintiff to money damages. We agree that the conspiracy is a cause of action apart from the UFCA and thus McElhanon is entitled to money damages.

■ However, the action for damages arising from conspiracy to commit a fraudulent conveyance is a remedy that should be used only where the remedies under the UFCA are inadequate. Such a situation may occur where the fraudulent transferee has subsequently transferred the property to a bona fide purchaser for value [*e.g., Transamerica v. Trout,* 145 Ariz. 355, 701 P.2d 851 (App.1985)] or where the fraudu-

---

1. The trial judge ruled that McElhanon's remedies under the UFCA were barred by the one year statute of limitations. (*See* trial judge's Memorandum Opinion and Order dated June 6, 1980.) This question is not before us on appeal. We note however that in *Transamerica v. Trout,*

145 Ariz. 355, 701 P.2d 851 (App.1985), the parties and this court assumed, based on prior Arizona authority, that the three-year statute of limitations applied to fraudulent conveyances. *See* A.R.S. § 12–543.

lent transferee has allowed, or, as in this case, caused the fraudulently transferred property to substantially decrease in value.

■ We hold that the common law action for damages against a conspirator in a fraudulent conveyance is the value of the property fraudulently transferred or the amount of the debt, whichever is less. Our formulation of damages is similar to the result reached by courts exercising their powers in equity to award money damages against a fraudulent transferee:

> We turn next to the question of the propriety of the money judgment imposed by the trial court against the fraudulent transferee Genevieve H. Miller. It is the general rule that as long as the subject property remains in the possession of the fraudulent transferee in toto and is not depreciated by any action of the fraudulent transferee, a personal judgment against such transferee will not be sustained.
>
> However, under special circumstances it has nevertheless been held to be in equity's power to hold a fraudulent transferee personally liable. Such special circumstances generally involve some activity of the fraudulent transferee in causing the property involved to be depreciated in value while in his hands or causing the property, either wholly or in part, to be placed beyond the reach of the court. Equity in such event will not allow itself to be outwitted or frustrated. It has the power to and will go to the extent necessary to achieve equitable results. If a money judgment against the fraudulent transferee will accomplish the desired results, it will be imposed in favor of the judgment creditor. Such a judgment, however, by its very nature will be limited in amount to the loss in value of the subject property or if the property involved has been completely disposed of and beyond the reach of the court, the judgment will be limited to the full value of the property which would have otherwise been subject to the creditor's claim. Also, since such a personal judgment is to restore lost value in the property fraudulently conveyed, and is in lieu of returning this property fully to its prior ownership in the fraudulent transferor, the amount of this judgment when satisfied must be credited to the judgment claim.

*Miller v. Kaiser*, 164 Colo. 206, 213–14, 433 P.2d 772, 774–75 (1967) (citations omitted). *See also Damazo v. Wahby*, 269 Md. 252, 305 A.2d 138 (1973).

■ Hing claims that his acts as an attorney are privileged, unless he has engaged in malicious prosecution or abuse of process, which were not alleged. *Bird v. Rothman*, 128 Ariz. 599, 627 P.2d 1097 (App.1981), *cert. denied* 454 U.S. 865, 102 S.Ct. 327, 70 L.Ed.2d 166 (1981); *Lewis v. Swenson*, 126 Ariz. 561, 617 P.2d 69 (App. 1980). We disagree with Hing's position that his capacity as an attorney shields him from liability for his alleged participation in a conspiracy involving a fraudulent conveyance. *Bird v. Rothman* recognized that attorneys could be liable for the intentional torts of malicious prosecution and abuse of process, although in that case the facts did not support a claim for either. The privilege an attorney has for his actions in representing a client is a qualified one that does not extend to the intentional torts of malicious prosecution and abuse of process. Nor should the privilege apply to the intentional acts of furthering and participating in a fraudulent conveyance. We note that encouraging a fraudulent conveyance resulted in disciplinary action against an attorney in *Townsend v. State Bar*, 32 Cal.2d 592, 197 P.2d 326 (1948).

## EVIDENCE OF FRAUD BY HING

■ We must now turn to Hing's role in these events to determine whether he was a conspirator. From our review of the record we determine that there was sufficient evidence to support a finding that Hing participated in a conspiracy to fraudulently hinder and delay McElhanon as a judgment creditor in the collection of his judgment against Harris, and that, as a result, McElhanon suffered damage. The circumstantial evidence strongly indicates

that Hing drafted the stock transfer agreement and participated in the transfer discussion, knowing that Harris was or would be rendered insolvent, knowing that Greer was financially unstable if not insolvent, knowing that the consideration was inadequate and that the stock transfer agreement itself was a sham, and with the actual intention on Hing's part of hindering, delaying, and defrauding McElhanon. Additionally, based upon the delay occasioned by Hing's acts and those of his co-conspirators, including the looting of the corporation by the co-conspirators, the value of the stock subsequently decreased so as to give rise to a cause of action for money damages by McElhanon against the fraudulent transferee, Greer, and vicariously against Hing who was a co-conspirator, relating to the original unlawful act, the fraudulent transfer.[2] We do believe that Hing's legal pleadings in cause no. 249999, subsequent to the fraudulent conveyance, were circumstantial evidence of his knowing participation along with Harris and Greer in wrongfully attempting to delay the defrauded judgment creditor, McElhanon. In and of themselves, these subsequent filings were not actionable, but they were material in establishing that the fraudulent transfer was a proximate cause of the subsequent diminution in value of the stock. Certainly, if it is assumed that Hing did not knowingly participate in the fraudulent conveyance transaction, Hing's subsequent actions could not have resulted in a claim against him. Likewise, as recognized by both the trial judge and McElhanon, the mere showing of the fraudulent transaction and Hing's knowing participation therein, would not alone have entitled McElhanon to assert any claim for damages against Hing. In such an event, McElhanon's recourse would have been to assert an appropriate remedy against the fraudulently transferred property pursuant to the UFCA. *See* A.R.S. § 44–1009 and *supra*, at 263. Before any claim could be asserted

against Hing, McElhanon had to show that because of the delay occasioned by the unlawful transfer and the acts of the conspirators the value of the stock decreased to the detriment of the plaintiff. Hing admits that he prepared the October 13th conveyance agreement and he admits the filing of various pleadings to reverse the trial court's decision in cause no. 249999 and to stay enforcement of the judgment therein.

Hing raises one further argument as to the sufficiency of the evidence. This contention relates to the use of circumstantial evidence to establish the existence of a conspiracy. Although he agrees that in general on a challenge to the sufficiency of the evidence, all evidence must be taken in the light most favorable to the appellee who is entitled to all reasonable inferences, Hing claims that in a conspiracy case this rule as applied to circumstantial evidence is limited. Hing relies on *O'Brien v. Larson*, 11 Wash.App. 52, 521 P.2d 228 (1974) in which the appellate court affirmed the trial court's dismissal of a conspiracy charge holding that the alleged acts were not inconsistent with a lawful or honest purpose.

> While it is recognized that a conspiracy may be, and usually must be, proved by acts and circumstances sufficient to warrant an inference that the defendants have reached an agreement to act together for the purpose alleged, the test of the sufficiency of the evidence is that the facts and circumstances relied upon to establish the conspiracy must be inconsistent with a lawful or honest purpose and reasonably consistent only with the existence of the conspiracy.

11 Wash.App. at 55–56, 521 P.2d at 231, quoting *Baun v. Lumber & Sawmill Workers, Local 2740*, 46 Wash.2d 645, 284 P.2d 275 (1955). *See also, Dill v. Rader*, 583 P.2d 496 (Okla.1978) (evidence must lead to belief); *Tribune Co. v. Thompson*, 342 Ill. 503, 174 N.E. 561 (1930) (evidence

---

**2.** We need not determine that there was substantial evidence to indicate that Hing was involved in any other conspiracy with Greer and Harris, nor that he had any knowledge of Greer and Harris's looting of the corporation of its assets, nor that he had any plan to gain control of the corporation for his own purposes.

must be clear and convincing that circumstances are more consistent with guilt than with innocence).

We reject this suggested limitation on the weight to be given circumstantial evidence. In *State v. Harvill*, 106 Ariz. 386, 476 P.2d 841 (1970) the Arizona Supreme Court thoroughly discussed and overruled its prior opinions regarding the weight to be accorded circumstantial evidence, and held that the probative value of direct evidence and circumstantial evidence were intrinsically similar, and that even though the burden of proof in the case before it was beyond a reasonable doubt, the trial court did not err in instructing the jury that the law makes no distinction between circumstantial and direct evidence. Accordingly, we find no error on this issue.

## JURY INSTRUCTIONS

Hing first states that the trial court erred in not instructing the jury on the traditional nine elements of fraud. *Staheli v. Kauffman*, 122 Ariz. 380, 595 P.2d 172 (1979); *Wilson v. Byrd*, 79 Ariz. 302, 288 P.2d 1079 (1955). Instead the court gave the following instruction, over objection, as to the elements of the plaintiff's case:

> The elements of conspiracy to delay, hinder and defraud a judgment creditor are as follows:
> (1) An unlawful agreement;
> (2) With the specific intent of each member of the conspiracy to hinder, delay and defraud a judgment creditor;
> (3) Acts committed pursuant to the unlawful agreement; and
> (4) Damages caused by the acts committed pursuant to the unlawful agreement.

Hing complains that this instruction creates a rule of law that any attorney who advises a debtor as to a conveyance which may somehow hinder a creditor from collecting a debt will be liable to the creditor if the transaction is ultimately found to be a fraudulent conveyance. He also complains that "unlawful," "hinder," "delay" and "defraud" were not defined for the jury. Hing's complaints are without merit. This was not an action for fraudulent misrepresentation, and the trial court did not err in refusing an instruction relating to fraudulent misrepresentation. The jury was instructed that intent to defraud was an element of the plaintiff's claim and that it must be proven by clear and convincing evidence. The jury was also advised of the elements of a claim for conspiracy to hinder, delay or defraud a judgment creditor and that fraud is an action "of an affirmative evil nature, such as proceeding or acting dishonestly, intentionally, maliciously, and deliberately, with a wicked motive, to cheat or deceive one party, which results in that party's damage or loss." In view of these instructions we hold that the jury was adequately advised of the nature of the fraudulent intent which must be proven in order to find Hing liable.

As to Hing's claim that the court did not define the term "unlawful," his brief does not give us a specific citation to the record indicating that objection was made to this instruction on this ground nor have we noted in the record any request for an instruction concerning the meaning of "unlawful." Accordingly, any objection to the failure to define "unlawful" has been waived. *Maxwell v. Aetna Life Ins. Co.*, 143 Ariz. 205, 693 P.2d 348 (App.1984).

Hing also appears to argue that under the UFCA, many acts are defined as fraudulent without regard to actual fraudulent intent. From this premise he infers that the court's instructions would have allowed a finding of liability on Hing's part based solely on a violation of the constructive fraud sections of the UFCA and without a showing of actual fraudulent intent. We reject this contention. When the instructions are read and considered as a whole it is clear that the jury was properly instructed as to the necessity of a finding of actual fraudulent intent on Hing's part.

Hing's next contention is that the court gave misleading instructions "as to the effect of a 'conspiracy' among the defendants." The instruction complained of was in part as follows:

There is no cause of action for an agreement to cause damage by unlawful means, unless in furtherance of such an agreement, unlawful acts are committed, and damage results from the acts.

Hing's objection is technically correct, since when considered alone the instruction does imply that there is a cause of action for conspiracy. We find no prejudice, however, since it is clear that the jury was correctly instructed that no liability could be found based upon conspiracy alone, and that liability must be based on damages resulting from an unlawful act committed pursuant to the conspiracy.

We have considered the remaining instruction issues raised by Hing and find no error.

## INCLUSION OF GREER IN THE ACTION

■ Although Harris, the party from whom the stock was transferred, was not named as a party to this action, Greer, the party to whom the stock was transferred, was named as a party. Greer did not answer the complaint nor did he appear at any hearings or depositions in person or through counsel. Greer filed a bankruptcy petition in October, 1976 resulting in an automatic stay of all actions against him. At the time of trial the stay had been lifted and the defendants filed a motion to try the Greer case separately. The motion was denied. Although the court stated it would direct a verdict against Greer, McElhanon proceeded to trial with Greer as a defendant. Evidence was offered and received against Greer which Hing complains was improper, irrelevant and prejudicial as to Hing. Hing claims the trial court erred in refusing to separate the trials.

Under rule 42(b), Arizona Rules of Civil Procedure, "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim ... or of any ... issue." Whether to grant a motion for separate trial is within the trial court's discretion. *Morley v. Superior Court,* 131 Ariz. 85, 638 P.2d 1331 (1982). We do not find that the trial judge abused his discretion.

## MISCONDUCT OF McELHANON'S COUNSEL

The remaining issues in the appeal are all based on allegations of misconduct of McElhanon's counsel, Jack E. Evans (Evans). We must consider each allegation individually as well as the totality of these allegations.

### I. Counsel's Opening Statement.

Hing complains first that even though the trial court had consistently ruled it was inadmissible, Evans, in his opening statement referred to the judgment in bankruptcy court that the transfer from Harris to Greer was fraudulent. In a previous memorandum decision of this court, *Hing v. Southwest Restaurant Systems, Inc.* (1 CA–CIV 4058 filed March 1, 1979) we held that the bankruptcy court's findings were not res judicata or barred by collateral estoppel against Hing and that Hing would have the right to contest those issues at trial in state court. McElhanon's position is that reference to the bankruptcy court's judgment was admissible against Greer and Hing. Specifically as to Hing, McElhanon states that no prejudice resulted since Hing has not attacked any of the evidence, ruling or instructions regarding the fraudulent conveyance.

The jury was given the standard instruction that arguments of counsel are not evidence and should not be regarded as such. Prior to trial, however, Hing and Grace had filed a motion in limine on this issue. Following a hearing the trial court ruled the findings of fact and conclusions of law of the bankruptcy court were inadmissible as a matter of law against Hing and Grace. Nevertheless, in opening statement Evans stated:

First, the bankruptcy court said, 'Let's find—let's dispose of this transfer between Harris and Greer. Let's have a trial.' And they had a trial.

And, after that trial, the bankruptcy court said, 'That sale is fraudulent. It was made to hinder, delay and defraud this man's judgment. Mr. Greer's promise was worth nothing. It was made when Mr. Harris was insolvent. Mr. Greer was insolvent. The whole things [sic] was fraudulent.'

An objection was made and sustained. However Evans immediately emphasized the point by stating:

Going forward, the bankruptcy court determined that the transfer from Harris to Greer was fraudulent and said, 'Greer doesn't own that stock. Harris owns it.'

Throughout the trial other references were made to the bankruptcy judgment, objections to which were also sustained. Evans offered the judgment in evidence but objections to the document were sustained. Evans again referred to the bankruptcy court's judgment in his closing argument.

■ McElhanon takes the position that Greer and Grace were collaterally estopped to deny the findings of fact and conclusions of law of the federal court in the bankruptcy case, and therefore these were admissible against them. McElhanon states in his answering brief that, "It was error for the trial court to rule that the jury was to ignore counsel's remarks in his opening statement regarding the bankruptcy court's judgment." McElhanon has not properly designated this as a "cross-issue" on appeal. *Santanello v. Cooper*, 106 Ariz. 262, 475 P.2d 246 (1970); Arizona Appellate Handbook § 3.2.2. Because McElhanon has not properly raised this question on appeal through the appropriate mechanism of cross-assignment of error we decline to consider whether the trial court's ruling on the motion in limine was correct. *DeLozier v. Smith*, 22 Ariz.App. 136, 524 P.2d 970 (1974).

McElhanon states that, assuming it was improper for counsel to mention the bankruptcy proceedings, no prejudice flowed to Hing. The trial court properly instructed the jury regarding the remarks of counsel. McElhanon then states that since Hing has not attacked any of the evidence, rulings, or instructions regarding the fraudulent conveyance finding in the bankruptcy action, Hing cannot be prejudiced by reference to the federal bankruptcy court proceedings. Hing replies that this position is incredible in view of the earlier decision by this court in a special action:

[W]e cannot agree that the finding of fraudulent conveyance as an underlying fact constituted a conclusive determination of status capable of being wielded against a party taking no part in the earlier proceedings.

*Hing v. Southwest Restaurants Systems, Inc.*, slip op. at 4. That ruling was followed by the superior court's order dated May 23, 1980 which was for the benefit of both Hing and Grace.

It is clear from the record and procedural history of the case that Evans acted improperly in referring to the bankruptcy court judgment and in attempting to introduce it into evidence. We believe it is also arguable that these actions were prejudicial to Hing. Hing characterizes them as an attempt to tar him with Greer's crimes and misconduct. Following the improper references in McElhanon's opening statement, Hing moved for a mistrial. The trial judge after hearing argument on the motion said:

I think it can be cured.

\*      \*      \*      \*      \*      \*

What I would propose to do is advise the jury, prior to the resumption of opening statements, that Mr. Evans referred to a ruling by another Judge in a totally separate proceeding; that ruling has no relevance to this action against Mr. Hing and Mr. Grace and has no binding affect [sic] on this jury or this Court.

Following argument the trial court denied the motion for mistrial. Thereafter Hing asked for a stay in order to file a special action regarding the denial of the motion for mistrial. The trial court denied the stay. The petition for special action was filed with this court which declined to accept jurisdiction [*Hing v. Superior Court/Derickson/McElhanon*, 1 CA–CIV

5457 (1980) ]. Following the denial of the motion for mistrial the trial court prepared a curative instruction which was then given to the jury as follows:

> I will tell you that from time to time it becomes necessary to take up certain legal matters and all I can tell you is that, in the future, we will seek very carefully to confine our discussions about legal matters to the periods of time after, ordinarily, we are ready to proceed in court with the jury presentation. If you have any burning desire—any of you—to hold the fact of the delay against anyone, please hold it against me and not the parties to this litigation.

> In opening statement yesterday, Mr. Evans may have inadvertently referred to a ruling by another Judge in another proceeding with respect to the validity of the stock transfer. Whatever the ruling was, it has no binding effect as to either Mr. Hing or Mr. Grace with respect to the court issues now on trial; that is, whether Mr. Hing and/or Mr. Grace unlawfully conspired to defraud Mr. McElhanon of his rights as a judgment creditor.

> By this statement to you, I do not mean to suggest that Mr. Evans has done anything intentionally improper, nor should you hold it against him or his client. As I stated before, opening statements are solely for the purpose of giving you an overview of what each party intends and hopes to prove through the testimony of witnesses and the admission of exhibits. Opening statements are not evidence and you may base your verdict only upon the evidence that is presented in court and the instructions of law which I will give you at the end of the case and on no other basis.

> These instructions, which I gave you yesterday and what I have told you now, apply to all the parties in this case.

Following this and despite the trial court's repeated rulings, Evans, completely undaunted, moved to admit into evidence the findings of fact and conclusions of law of the federal bankruptcy court. The trial judge sustained Hing's objection to the document. Evans doggedly continued to bring up the matter and specifically mentioned it again in closing argument. Hing again moved for a mistrial and the motion was denied. The trial court in that regard said, "I don't find the passing reference to it as fundamental error or prejudicial error to the Defendants Hings or Defendants Grace."

The question we must answer is whether the trial court abused its discretion in denying these motions for mistrial. "The grant or denial of a motion for new trial on the ground of misconduct is a matter within the trial court's discretion; in exercising that discretion, the trial court must decide whether the misconduct has materially affected the rights of the aggrieved party." *Grant v. Arizona Public Service Co.*, 133 Ariz. 434, 454, 652 P.2d 507, 527 (1982). The case holds that in order to reverse a denial of a mistrial it must be clearly established that the misconduct actually influenced the verdict; the defendants failed to meet this standard in *Grant* so there was no abuse of discretion. *See also* rule 61, Arizona Rules of Civil Procedure.

The trial court in the case before us found that the passing references were not prejudicial error as to Hing. It is our task only to determine if that finding by the trial court was an abuse of discretion even though we find the conduct to be improper and to constitute misconduct of counsel. To determine this we consider the guidelines set forth in *Grant v. Arizona Public Service:*

1. Whether there has been an error of law committed in the process of reaching the discretionary conclusion.

2. Whether the discretionary conclusion was reached without consideration of the evidence.

3. Whether other, substantial error of law has occurred as part of or in addition to the misconduct.

4. Whether our review of the record convinces us that there is no substan-

tial basis for the trial court's discretionary holding.

Applying the above criteria we cannot say there was an abuse of discretion as to this issue even though the conduct of counsel was deplorable. A mistrial is never granted as a disciplinary measure but only to prevent a miscarriage of justice. *Grant v. Arizona Public Service; Zugsmith v. Mullins*, 86 Ariz. 236, 344 P.2d 739 (1959).

## II. The Ex Parte Conference.

During the trial in chambers with all attorneys present, Evans and the trial judge discussed the propriety of Evans reading from portions of deposition transcripts. Evans was concerned that the judge was angry at him and that the judge had conveyed that anger to the jury. In chambers Evans stated:

> If you want to bring me in here at anytime and dress me down, I will be here and I recognize the court's authority in that regard, but in front of the jury just tears me up.

There followed a long and heated conversation between the trial judge and Evans who apparently threw some files or papers and said:

> MR. EVANS: As the record will indicate, the Court believes I have been guilty of misconduct in the presentation of this case, Harvey [McElhanon].
>
> THE COURT: If the record indicates that, I will accept whatever.
>
> MR. EVANS: Harvey, he believes I have misrepresented the facts in this case to the court and the jury. So we will talk about it.
>
> THE COURT: I am not going to say that's what I believe, but we will talk about it.
>
> MR. EVANS: Let's go, Harvey.

The next day the record begins as follows: "(Whereupon the following took place in chambers.)" The only persons present were the trial judge, the court reporter, Evans and McElhanon. The judge stated, "This is a conference with Mr. Evans, Mr. McElhanon and the court with respect to certain things that came up yesterday afternoon." An effort by the trial judge to defuse the anger from the previous day was followed by allegations of perjury and subornation of perjury made by both McElhanon and Evans against the attorney defendants in the case, Grace and Hing. They also discussed with the judge whether the judge was going to declare a mistrial based on the conduct of Evans. The *ex parte* hearing ended with a request by Evans that the judge report the "perjured" testimony of the attorney defendants to the bar association and to the county attorney for prosecution.

Later that day the court reporter's notes of this hearing were read to the other counsel. Following that reading, counsel for one of the defendants requested that the trial judge disqualify himself on the basis of judicial misconduct and the Code of Judicial Conduct Canon 3 Parts (C)(1) and (D), rule 45, Arizona Rules of the Supreme Court. (Now renumbered rule 81, effective February 1, 1985.) Following a lengthy discussion on the record, the trial judge granted the motion for mistrial. Thereafter Evans made a lengthy and impassioned objection to the granting of the mistrial. The trial judge then ruled as follows, "I am going to take back what I said before. I am going to deny the motion for mistrial." The trial then resumed.

On the basis of these proceedings we must reverse this case. We believe that at this point the trial judge lost control of the case and there could no longer be a fair and impartial trial. We are guided in doing so by our supreme court in *Grant v. Arizona Public Service:*

> We are urged to follow a line of cases which hold that prejudice must be presumed even when it cannot be demonstrated because the trial court failed to admonish the jury to disregard the misconduct. These cases, however, were situations in which, for one reason or another, the trial court seems to have lost control over the entire trial, so that the reviewing court must conclude that the trial proceedings were a virtual mockery of the concept of a fair and impartial

trial. In *Love v. Wolf,* 226 Cal.App.2d 378, 38 Cal.Rptr. 183 (1964), the appellate court detailed counsel's misconduct from opening statement through final argument, characterizing the misconduct as "egregious beyond any in our experience or that related in any reported case...." *Id.* at 382, 38 Cal.Rptr. at 184. The court found the trial judge's "loss of ... control" of the case "very puzzling." *Id.* at 391, 38 Cal.Rptr. at 190. *See also Simmons v. Southern Pacific Transportation Company,* 62 Cal.App.3d 341, 133 Cal.Rptr. 42 (1976). Our review of this record does not permit the conclusion that the trial judge "lost control" of the case, nor that the court permitted counsel to engage in conduct which precluded a fair trial. Hopefully such a case will not arise; if it does come before us, we shall have no hesitancy in finding that denial of a motion for a new trial was an abuse of discretion.

133 Ariz. at 456, 652 P.2d at 529.

We are also influenced in our decision by the Code of Judicial Conduct, Canon 3(A)(4), rule 81, Arizona Rules of the Supreme Court, which provides, "A judge should ... neither initiate nor consider *ex parte* applications concerning a pending or impending proceeding." A rule of professional responsibility provides that, in the absence of opposing counsel, a member of the bar should neither communicate with nor argue to a judge except in open court upon the merits of a contested matter pending before that judge. DR 7–110, Code of Professional Responsibility, rule 29(a), Arizona Rules of the Supreme Court. *See also* ER 3.5, Rules of Professional Conduct, rule 42, Arizona Rules of the Supreme Court, effective February 1, 1985; *Heavey v. State Bar,* 17 Cal.3d 553, 131 Cal.Rptr. 406, 551 P.2d 1238 (1976); *In Re Berk,* 98 Wis.2d 443, 297 N.W.2d 28 (1980). We conclude that it is without question that the *ex parte* communications were about the merits of the litigation. McElhanon and Evans clearly impugned the credibility of the opposing parties and their testimony as well as the credibility of their witnesses.

McElhanon relies on Canon 3(A)(4) of the Code of Judicial Conduct which reads as follows:

A judge should ..., except *as authorized by law,* neither initiate nor consider *ex parte* applications concerning a pending or impending proceeding. [emphasis added]

McElhanon claims that the judge was "authorized by law" to hear an allegation of perjury or an allegation of attorney misconduct. Clearly what occurred in this case is not what was intended by the phrase "except as authorized by law." Certain *ex parte* proceedings are set forth by statute or rule and are therefore "authorized by law." *See, e.g.,* The Bankruptcy Code, 11 U.S.C.A. § 101 *et seq.;* A.R.S. § 14–3301 *et seq.; In Re Jordan,* 293 Or. 788, 652 P.2d 1268 (1982); A.R.S. § 12–213(A); rule 65(d), Arizona Rules of Civil Procedure. McElhanon's claim that his *ex parte* communication with the judge was authorized by law is entirely without merit for not only was it *not* authorized, it totally destroyed the sanctity of a fair trial. Even if we were to accept the contention that it was authorized by law it went beyond the mere reporting of an allegation of perjury. The judge asked McElhanon and Evans for suggestions on what to do about the allegations and suggestions were given.

We are mindful of the obligations under DR 1–103 of the Code of Professional Responsibility, rule 29(a), Rules of the Supreme Court, which states:

(A) A lawyer possessing unprivileged knowledge of a violation of DR 1–102 [attorney misconduct] shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation.

(B) A lawyer possessing unprivileged knowledge or evidence concerning another lawyer or a judge shall reveal fully such knowledge or evidence upon proper request of a tribunal or other authority empowered to investigate or act upon the conduct of lawyers or judges.

(Rule deleted, effective February 1, 1985; *see* ER 8.3(a) Rules of Professional Conduct, rule 42, Rules of the Supreme Court). However, there were several authorities to whom McElhanon and Evans could have reported the alleged violations other than the judge then presiding over the ongoing trial. Furthermore that judge was not "empowered to investigate or act upon such violation[s]" as long as he continued to preside over the trial in which the alleged violations occurred. The fact that Evans engaged in the *ex parte* proceeding unquestionably constituted misconduct on his part. DR 7–110(B), rule 29(a), Rules of the Supreme Court, now ER 3.5(b), rule 42, Rules of the Supreme Court. As to whether the impropriety of this *ex parte* proceeding affected the outcome of the trial, we note that before this proceeding the trial judge had stated that there was not sufficient evidence of a prima facie case to take the issue of punitive damages to the jury. After that conference, the trial judge reversed himself and allowed the issue of punitive damages to go to the jury.

For all of the above reasons the case must be reversed and remanded for a new trial.

Because we have determined to reverse, we need not consider the final issue raised in the opening brief which deals with prejudicial statements by McElhanon and the introduction of inadmissible evidence against Hing. With proper control these matters should not arise in any retrial of this case.

## CROSS–APPEAL

### MAY A JUDGMENT CREDITOR RECOVER DAMAGES IN EXCESS OF HIS JUDGMENT PLUS INCIDENTAL COSTS AS A RESULT OF A CONSPIRACY TO HINDER HIM FROM COLLECTING THE JUDGMENT?

McElhanon, in this cross-appeal, claims Hing's liability is not limited to the original $200,000 judgment obtained by McElhanon against Harris but extends to the entire loss which was the natural and probable consequence of any of the conspirator's wrongful acts. McElhanon claims that all of the conspirators knew that Harris could not pay the $200,000 judgment and that the only valuable right owned by McElhanon was the right to acquire Harris's stock in the restaurant corporations. The alleged purpose of the conspiracy was to prevent McElhanon from acquiring control of the restaurant corporations.

McElhanon offers two theories for holding Hing liable for all of the damages suffered. The first theory is that the damages are the direct consequence of Hing's continuing efforts to defeat McElhanon's rights to foreclose his post judgment garnishment lien on Harris's stock. The second theory arises from the liability imposed on a conspirator. McElhanon relies on the findings and judgment from the federal bankruptcy proceedings to claim damages based on Greer's and Harris's use of Southwest's assets to pay personal debts. None of these losses would have occurred had it not been for the conspiracy, alleges McElhanon. In October, 1975, McElhanon paid $1.1 million to acquire all of the stock in Southwest; therefore, he claims his minimum loss is two-thirds of $1.1 million as McElhanon would have owned two-thirds of the stock in October, 1973 but for the conspiracy. McElhanon's legal position is that a wrongdoer is liable for any injury which is the direct and proximate consequence of his wrongful acts. *Valley Nat'l Bank v. Brown*, 110 Ariz. 260, 517 P.2d 1256 (1974).

Hing responds that there is no evidence that Harris could not pay the $200,000 judgment, nor that he could not post an acceptable supersedeas bond. We agree with Hing that many of the factual statements made by McElhanon in relationship to the cross-appeal are not supported by the evidence. Furthermore McElhanon's theory of damages is founded on certain assumptions not proven in this lawsuit.

We hold that the amount of damages to which McElhanon would be entitled is limited to the amount of the debt which was made uncollectable plus incidental ex-

penses. Any other damages are speculative and therefore not recoverable. *Higgins v. Guerin,* 74 Ariz. 187, 245 P.2d 956; *Moody v. Burton,* 27 Me. 427 (1847); *Klaus v. Hennessey,* 13 R.I. 332 (1881). In so holding we follow other courts which have allowed recovery of money *proceeds* from a grantee but have held there is no right to recover money *damages. Findlay v. McAllister,* 113 U.S. 104, 5 S.Ct. 401, 28 L.Ed. 930 (1884); *James v. Powell,* 25 A.D.2d 1, 266 N.Y.S.2d 245 (1966); *see* Note, *Tort Liability for Fraudulent Conveyance,* 19 Stan.L.Rev. 636 (1967). *See also Transamerica v. Trout* (judgment creditor, in garnishment proceedings recovered proceeds of sale to bona fide purchaser for value from fraudulent transferee). We affirm the trial court's limiting of damages to the amount of McElhanon's judgment in the previous lawsuit plus incidental costs.

## SUMMARY

By holding herein that McElhanon has a valid claim for damages arising from conspiracy to defraud a judgment creditor by which he may recover money damages against Hing we have also determined that such a cause of action has the following required elements:

1. The plaintiff must be a judgment creditor.

2. The party against whom damages are claimed must be guilty of actual fraud, as opposed to constructive fraud. That is, he must know that the transfer will leave the debtor insolvent, that the transfer is for less than fair value, and that the purpose of the transfer is to hinder, delay, or defraud the judgment creditor-plaintiff.

3. Before the defendant can be found liable for money damages there must be a showing that the remedies directly provided by the UFCA are inadequate, i.e., that the fraudulently transferred property is no longer in the hands of the fraudulent transferee, or that by reason of the delay or some other reason resulting from the fraudulent transfer, the property has lost its value or has substantially decreased in value.

4. Damages are limited to the amount of the judgment creditor's judgment or the value of the property at the time of transfer, whichever is less along with incidental expenses. Damages, therefore, are not speculative.

Having recognized the cause of action as described we reverse this case due to the misconduct of court and counsel in holding an *ex parte* proceeding and remand the case for new trial or proceedings consistent with this opinion.

EUBANK and JACOBSON, JJ., concur.

NOTE: The issuance of the court's opinion in this appeal has been delayed because of Judge L. RAY HAIRE's decision, based upon events occurring after the submission of the appeal to the court, to disqualify himself from further participation in the proceeding.

Judge JACOBSON has been assigned by the Chief Judge to serve in place of Judge HAIRE.